No. 17-2900

In the United States Court of Appeals
for the Seventh Circuit

———————————————

Charles Curry, Jr., d/b/a Get Diesel Nutrition,

*Plaintiff-Appellant,*

v.

Revolution Laboratories, LLC,
Rev Labs Management, Inc.,
Joshua Nussbaum, and
Barry Nussbaum,

*Defendants-Appellees.*

———————————————

Appeal from the United States District Court
for the Northern District of Illinois
No. 1:17-cv-02283
Hon. Matthew F. Kennelly

———————————————

Brief and Required Short Appendix of
Court-Appointed Amicus Counsel
in Support of Reversal

———————————————

Allan Erbsen
*Counsel of Record*
University of Minnesota Law School
229 19th Avenue South
Minneapolis, MN  55455
(612) 626-6632
aerbsen@umn.edu

January 31, 2019

Oral Argument Requested

# RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>17-2900</u>

Short Caption: <u>Charles Curry v. Revolution Laboratories, LLC, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

      [ ]      PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    I am a court-appointed amicus counsel supporting reversal.

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    I am employed by the University of Minnesota Law School, but the Law School is listed in my address for identification

    purposes and is not counsel in this matter. Amicus did not appear in the District Court.

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

          N/A

    ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:
          N/A

---

Attorney's Signature:  <u>/s/ Allan Erbsen</u>          Date:  <u>Jan. 31, 2019</u>

Attorney's Printed Name:  <u>Allan Erbsen</u>

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).  Yes  <u>XX</u>    No     

Address:  <u>University of Minnesota Law School, 229 19th Avenue South, Minneapolis, MN, 55455</u>

Phone Number:  <u>(612) 626-6632</u>          Fax Number:  <u>N/A</u>

E-Mail Address:  <u>aerbsen@umn.edu</u>

## TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT ................................................. i

TABLE OF AUTHORITIES ........................................................... iv

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF ISSUES ............................................................ 5

STANDARD OF REVIEW ............................................................ 5

STATEMENT OF THE CASE ......................................................... 6

    A.  Plaintiff's Allegations ............................................. 6

    B.  Proceedings in the District Court ................................... 11

    C.  Defendants' Affidavits .............................................. 11

SUMMARY OF ARGUMENT ......................................................... 16

ARGUMENT ....................................................................... 17

I.  This appeal should focus primarily on jurisdiction over Revolution because the District Court never ruled on Curry's fact-intensive arguments supporting jurisdiction over the other three defendants. .......... 17

II.  Illinois can exercise specific jurisdiction because Revolution's direct sales to 767 Illinois residents caused harm in Illinois ................................ 22

    A.  The Supreme Court, this Court, and other circuits routinely uphold personal jurisdiction when out-of-state merchants directly sell products to consumers in the forum and claims relate to injuries arising from those sales. ............................................. 23

    B.  The District Court's holding relied on inapposite precedent. ................ 28

III.  An independent argument for specific jurisdiction is that Revolution intentionally aimed fraudulent conduct at a target in the forum and thereby caused economic and reputational harm in the forum ................... 32

    A.  Development of caselaw governing the aiming test. ............... 33

    B.  Application of the aiming test to Revolution. ......................... 44

    C.  The Nussbaums' conclusory and incredible affidavits do not overcome Curry's assumed-to-be true allegations. ................................. 47

  IV. Although specific jurisdiction exists in Illinois, the record does not support general jurisdiction. .......................................................... 49

CONCLUSION ............................................................................................ 52

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS ......... 54

# TABLE OF AUTHORITIES

## Cases

*Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*,
817 F.3d 755 (Fed. Cir. 2016) ............................................................ 42

*Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*,
751 F.3d 796 (7th Cir. 2014) ...................................................... passim

*Alderson v. S. Co.*,
321 Ill. App. 3d 832 (1st Dist. 2001) ................................................. 50

*ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*,
293 F.3d 707 (4th Cir. 2002) ............................................................ 38

*Americold Realty Tr. v. Conagra Foods, Inc.*,
136 S. Ct. 1012 (2016) ....................................................................... 2

*Ammerman v. Sween*,
54 F.3d 423 (7th Cir. 1995) ............................................................... 1

*Ariel Invs., LLC v. Ariel Capital Advisors LLC*,
881 F.3d 520 (7th Cir. 2018) ........................................................... 43

*BNSF Ry. Co. v. Tyrrell*,
137 S. Ct. 1549 (2017) ..................................................................... 51

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) .................................................................. passim

*Calder v. Jones*,
465 U.S. 783 (1984) .................................................................. passim

*Chloe v. Queen Bee of Beverly Hills, LLC*,
616 F.3d 158 (2d Cir. 2010) ............................................................ 27

*CollegeSource, Inc. v. AcademyOne, Inc.*,
653 F.3d 1066 (9th Cir. 2011) .................................................... 34, 35

*Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*,
395 F.3d 1315 (Fed. Cir. 2005) ........................................................ 20

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) .................................................................. 50, 51

*Dakota Indus., Inc. v. Dakota Sportswear, Inc.*,
946 F.2d 1384 (8th Cir. 1991) ......................................................... 38

*Dean v. Motel 6 Operating L.P.*,
134 F.3d 1269 (6th Cir. 1998) ......................................................... 47

*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*,
514 F.3d 1063 (10th Cir. 2008) ....................................................... 48

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC,*
    844 F.3d 79 (2d Cir. 2016) ................................................................. 18

*Felland v. Clifton,*
    682 F.3d 665 (7th Cir. 2012) .......................................................... 6, 47

*Fiore v. Walden,*
    688 F.3d 558 (9th Cir. 2012) ............................................................. 40

*Fiore v. Walden,*
    No. 2:07-CV-01674-ECR, 2008 WL 9833854 (D. Nev. Oct. 17, 2008) ............... 40

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
    564 U.S. 915 (2011) ............................................................ 37, 50, 51

*Guar. Bank v. Chubb Corp.,*
    538 F.3d 587 (7th Cir. 2008) ............................................................... 9

*Gucci Am., Inc. v. Weixing Li,*
    768 F.3d 122 (2d Cir. 2014) ............................................................... 52

*Hanson v. Denckla,*
    357 U.S. 235 (1958) ........................................................................ 41

*Hardy v. Pioneer Parachute Co.,*
    531 F.2d 193 (4th Cir. 1976) ............................................................. 26

*Hyatt Int'l Corp. v. Coco,*
    302 F.3d 707 (7th Cir. 2002) ............................................................. 23

*Illinois v. Hemi Grp. LLC,*
    622 F.3d 754 (7th Cir. 2010) ................................................... passim

*Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd. P'ship.,*
    34 F.3d 410 (7th Cir. 1994) .......................................................... 37, 38

*Int'l Shoe Co. v. Washington,*
    326 U.S. 310 (1945) .................................................................... 22, 34

*J. McIntyre Mach., Ltd. v. Nicastro,*
    564 U.S. 873 (2011) .................................................................... 24, 46

*Janmark, Inc. v. Reidy,*
    132 F.3d 1200 (7th Cir. 1997) ........................................................... 39

*JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.,*
    536 U.S. 88 (2002) ........................................................................... 3

*Keeton v. Hustler Magazine, Inc.,*
    465 U.S. 770 (1984) .................................................................... 23, 37

*Kipp v. Ski Enter. Corp. of Wis.,*
    783 F.3d 695 (7th Cir. 2015) ............................................................. 50

*Kulko v. Superior Court*,
436 U.S. 84 (1978) .................................................................. 35

*Lear Corp. v. Johnson Elec. Holdings Ltd.*,
353 F.3d 580 (7th Cir. 2003) ...................................................... 2

*Licciardello v. Lovelady*,
544 F.3d 1280 (11th Cir. 2008) ........................................ 38, 45, 46

*Logan Prods., Inc. v. Optibase, Inc.*,
103 F.3d 49 (7th Cir. 1996) ...................................................... 26

*Louis Vuitton Malletier, S.A. v. Mosseri*,
736 F.3d 1339 (11th Cir. 2013) ........................................ 27, 30, 49

*Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.*,
264 F.3d 32 (2d Cir. 2001) ........................................................ 19

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
647 F.3d 1218 (9th Cir. 2011) .................................................... 52

*McDonald v. Household Int'l, Inc.*,
425 F.3d 424 (7th Cir. 2005) ...................................................... 4

*McFadin v. Gerber*,
587 F.3d 753 (5th Cir. 2009) ..................................................... 38

*McGee v. Int'l Life Ins. Co.*,
355 U.S. 220 (1957) ........................................................... 23, 38

*Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston
Metroplex, P.A.*, 623 F.3d 440 (7th Cir. 2010) ....................... 28, 29, 39

*Monster Energy Co. v. Wensheng*,
136 F. Supp. 3d 897 (N.D. Ill. 2015) ........................................... 32

*Nelson by Carson v. Park Indus., Inc.*,
717 F.2d 1120 (7th Cir. 1983) ................................................... 47

*Neogen Corp. v. Neo Gen Screening, Inc.*,
282 F.3d 883 (6th Cir. 2002) ..................................................... 27

*Ohio State Univ. v. Ohio Univ.*,
51 U.S.P.Q.2d 1289 (T.T.A.B. 1999) ............................................ 15

*Panavision Int'l, L.P. v. Toeppen*,
141 F.3d 1316 (9th Cir. 1998) ................................................... 38

*Parker v. Four Seasons Hotels, Ltd.*,
845 F.3d 807 (7th Cir. 2017) ..................................................... 44

*Pennoyer v. Neff*,
95 U.S. 714 (1878) ........................................................... 22, 34

*Philos Techs., Inc. v. Philos & D, Inc.*,
  802 F.3d 905 (7th Cir. 2015) .................................................................. 19

*Republic Techs. (NA), LLC v. BBK Tobacco & Foods, LLP*,
  No. 16-CV-3401, 2017 WL 3386116 (N.D. Ill. Aug. 7, 2017) ............................ 32

*Rice v. Rice Found.*,
  610 F.2d 471 (7th Cir. 1979) .................................................................. 19

*RTP LLC v. ORIX Real Estate Capital, Inc.*,
  827 F.3d 689 (7th Cir. 2016) .................................................................... 2

*Rush v. Savchuk*,
  444 U.S. 320 (1980) ............................................................................. 40

*San Diego Cty. Credit Union v. Citizens Equity First Credit Union*,
  325 F. Supp. 3d 1088 (S.D. Cal. 2018) ...................................................... 21

*South Dakota v. Wayfair, Inc.*,
  138 S. Ct. 2080 (2018) .......................................................................... 24

*Stockman v. LaCroix*,
  790 F.2d 584 (7th Cir. 1986) .................................................................... 4

*Tamburo v. Dworkin*,
  601 F.3d 693 (7th Cir. 2010) ....................................................... 33, 37, 46

*Toys "R" Us, Inc. v. Step Two, S.A.*,
  318 F.3d 446 (3d Cir. 2003) .................................................................... 20

*uBID, Inc. v. GoDaddy Grp., Inc.*,
  623 F.3d 421 (7th Cir. 2010) .......................................................... passim

*United Mine Workers of Am. v. Gibbs*,
  383 U.S. 715 (1966) ............................................................................... 1

*Valtech, LLC v. 18th Ave. Toys Ltd.*,
  No. 14 C 134, 2015 WL 603854 (N.D. Ill. Feb. 12, 2015) ............................... 32

*Walden v. Fiore*,
  571 U.S. 277 (2014) ....................................................................... passim

*Walker v. Kruse*,
  484 F.2d 802 (7th Cir. 1973) .................................................................... 4

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980) ........................................................................ 24, 40

**Statutes, Regulations, and Rules**

15 U.S.C. § 1052 ...................................................................................... 9

15 U.S.C. § 1116 ...................................................................................... 1

15 U.S.C. § 1117 ...................................................................................... 1

15 U.S.C. § 1120 ................................................................ 1, 10, 20, 21

15 U.S.C. § 1125 .................................................................... 1, 9, 10

28 U.S.C. § 1291 ............................................................................. 4

28 U.S.C. § 1331 ............................................................................. 1

28 U.S.C. § 1332 .................................................................... 1, 2, 3

28 U.S.C. § 1338 ............................................................................. 1

28 U.S.C. § 1367 ........................................................................ 1, 4

28 U.S.C. § 1653 ............................................................................. 4

37 C.F.R. § 2.34 .............................................................................. 9

815 ILCS § 505/1 .......................................................................... 10

815 ILCS § 510/1 .......................................................................... 10

Fed. R. Civ. P. 12(b)(2) ................................................................. 44

Fed. R. Civ. P. 59 ...................................................................... 4, 11

Fed. R. Civ. P. 8 ........................................................................... 44

**Other Authorities**

6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31:77 (5th ed. 2018) ........................................ 15

Allan Erbsen, *Personal Jurisdiction Based on the Local Effects of Intentional Misconduct*, 57 WM. & MARY L. REV. 385 (2015) ............................ 43

*Dependencies and Areas of Special Sovereignty*, U.S. Dep't of State, https://www.state.gov/s/inr/rls/10543.htm ............................................. 3

Restatement (Second) of Conflict of Laws § 37 (1971) ........................................ 33, 35

# JURISDICTIONAL STATEMENT

The District Court had federal question jurisdiction over plaintiff's four claims "arising under" federal statutes related to trademarks and unfair competition. 28 U.S.C. §§ 1331, 1338; SA13–20 (claims 3, 4, 6, and 7, invoking 15 U.S.C. §§ 1116, 1117, 1120, 1125).[1] Plaintiff's remaining three claims for fraud, unfair competition, and trademark infringement arise under two Illinois statutes and Illinois common law. SA11–13, 17–18 (claims 1, 2, and 5). The state and federal claims share a "common nucleus of operative fact," *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966), and are part of the same "case or controversy," 28 U.S.C. § 1367(a). The District Court therefore had supplemental jurisdiction over the state claims. *See Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir. 1995) (noting that even a "loose factual connection" would be sufficient to confer supplemental jurisdiction).

Plaintiff also alleged diversity jurisdiction under 28 U.S.C. § 1332(a) as an alternative to supplemental jurisdiction. SA03, ¶ 7. The amount in controversy exceeds $75,000 (SA03, ¶ 7), but the Complaint emphasizes the parties' residence rather than citizenship (SA02, ¶¶ 2–6). Defendants subsequently provided facts establishing complete diversity. Dkt. 27.

According to the defendants' filing, plaintiff is a citizen of Illinois, the two individual defendants (Joshua and Barry Nussbaum) are citizens of California, and

---

[1] Citations to materials in the record are in the following forms: "A__" (attached Short Appendix); "SA__" (Separate Appendix); "Dkt. __" (this Court's Docket); and "DC Dkt. __" (the District Court's Docket).

the corporate defendant (Management) is incorporated in Nevada and has its principal place of business in California. *Id.* at 1. The LLC defendant (Revolution) is formed under the laws of Nevada and has its principal place of business in California. *Id.* As an LLC, Revolution derives its citizenship from its three members. *See RTP LLC v. ORIX Real Estate Capital, Inc.*, 827 F.3d 689, 691 (7th Cir. 2016). Revolution's members include a series of nested entities. The chain unwinds as follows: (1) Revolution's first member is NNE, LLC; (2) NNE is formed under the laws of Wyoming and its sole member is Joshua Nussbaum; (3) as noted above, Joshua is a citizen of California; (4) Revolution's second member is Management, which as noted above is a citizen of Nevada and California; (5) Revolution's third member is LT Holdings, LLC; (6) LT is formed under the laws of the Cook Islands and its sole member is BNC Woodside, LLC; (7) BNC is formed under the laws of Delaware and its sole member is Nussbaum Family Trust Settlement ("the Trust"); (8) the Trust is a traditional trust formed under the laws of the Cook Islands and derives citizenship from its two trustees, see *Americold Realty Tr. v. Conagra Foods, Inc.*, 136 S. Ct. 1012, 1016 (2016) ("when an artificial entity is sued in *its* name, it takes the citizenship of each of its members"); (9) the first trustee is Joshua Nussbaum, who as noted above is a citizen of California; (10) the second trustee is Ora Fiduciary Limited ("Ora"), which is a "limited by shares" trust company organized under the laws of the Cook Islands that for diversity purposes is treated analogously to a corporation under 28 U.S.C. § 1332(c)(1), see *Lear Corp. v. Johnson Elec. Holdings Ltd.*, 353 F.3d 580, 583 (7th Cir. 2003); and

(11) Ora is incorporated in and has its principal place of business in the Cook Islands.  Dkt. 27 at 2–4.

Ora's nexus with the Cook Islands raises an additional complication because the islands are a foreign dependency rather than an independent sovereign.  The defendants characterize Ora as a "citizen of the Cook Islands."  Dkt. 27 at 5.  However, the relevant question is whether Ora is a "citizen[] or subject[] of a foreign state."  28 U.S.C. § 1332(a)(3).  The subtle distinction between citizens and subjects matters because the United States Department of State classifies the Cook Islands as a dependency of New Zealand.  *See Dependencies and Areas of Special Sovereignty*, U.S. Dep't of State, https://www.state.gov/s/inr/rls/10543.htm (last visited Jan. 30, 2019).  Courts generally treat Executive Branch recognition as dispositive of an entity's status as a "foreign state" under § 1332.  *See JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88, 92 (2002) (noting but declining to address this methodology).  Ora's Cook Islands citizenship therefore is probably not a basis for jurisdiction under § 1332(a)(3) and the record is silent about whether Ora is also a citizen of New Zealand.  However, Ora's citizenship in a dependency of New Zealand makes it a "subject" of New Zealand, so diversity jurisdiction is still proper.  *See Traffic Stream*, 536 U.S. at 90, 99 (holding that "a corporation organized under the laws of the British Virgin Islands (BVI)" is a "subject" of the United Kingdom for purposes of 28 U.S.C. § 1332(a)(2)).  Accordingly, Revolution does not defeat diversity because it is a citizen of California and Nevada and a subject of New Zealand.

The defendants' filing (Dkt. 27) appears to resolve concerns that the Court raised in two orders addressing citizenship. Dkt. 20, 22. If concerns remain, the existence of supplemental jurisdiction enables the Court to avoid addressing uncertainty about diversity. *See McDonald v. Household Int'l, Inc.*, 425 F.3d 424, 426 (7th Cir. 2005) ("If this case depended entirely on diversity jurisdiction, we would probably be inclined to remand for the limited purpose of clarifying … citizenship.… [H]owever, the case is securely within the federal question jurisdiction, and we have no need to take this step."); *Stockman v. LaCroix*, 790 F.2d 584, 587 (7th Cir. 1986) (noting that ideally the District Court rather than this court should resolve factual questions about citizenship). The District Court can revisit citizenship if the difference between diversity jurisdiction and supplemental jurisdiction matters on remand. *Compare* 28 U.S.C. § 1367(c) (granting district courts discretion to decline supplemental jurisdiction), *with Walker v. Kruse*, 484 F.2d 802, 803 (7th Cir. 1973) (Stevens, J.) ("Except in extraordinary situations, federal courts should not abstain from deciding state law issues in diversity cases."). *See also* 28 U.S.C. § 1653 ("Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts.").

This Court has appellate jurisdiction under 28 U.S.C. § 1291. The District Court entered a final judgment dismissing all claims on August 15, 2017. A13. The plaintiff filed a motion to alter or amend the judgment under Fed. R. Civ. P. 59(e) on September 1, 2017. DC Dkt. 49. The District Court denied plaintiff's Rule 59

motion on September 10, 2017. A14. Plaintiff filed a timely notice of appeal on Sept. 13, 2017. DC Dkt. 53.

## STATEMENT OF ISSUES

Plaintiff is an entrepreneur who sells an award-winning product. The defendants exploited plaintiff's success by misappropriating his brand to sell their own deceptively marketed counterfeit. They evaded accountability for fraud and trademark infringement when the District Court rejected personal jurisdiction. The questions presented on appeal are:

1. Whether the District Court erred by rejecting specific jurisdiction in Illinois over defendants who used deceptive practices to sell an infringing product directly to 767 consumers in Illinois; and

2. Whether the District Court erred by rejecting specific jurisdiction in Illinois over defendants who intentionally aimed tortious conduct toward a victim in Illinois and caused economic and reputational harm in Illinois.

## STANDARD OF REVIEW

This Court reviews the denial of personal jurisdiction de novo. *See uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 424 (7th Cir. 2010). The Court will "take the plaintiff's asserted facts as true and resolve any factual disputes in its favor." *Id.* at 423–24. "At this early stage in the litigation, and without the benefit of an evidentiary hearing, the plaintiff bears only the burden of making a prima facie case for personal jurisdiction." *Id.* at 423.

Amicus Counsel's access to the facts is limited to the record. Counsel is therefore in the same position as the Court and will likewise "accept as true all well-pleaded facts alleged in the complaint" when analyzing personal jurisdiction. *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012).

## A.    Plaintiff's Allegations

Plaintiff Charles Curry is the founder and CEO of a company in Illinois that sells dietary supplements oriented toward fitness enthusiasts and athletes. SA02, 04–05, ¶¶ 2, 11–12, 15. Curry based his brand on an inspiration he had while deployed as a member of the United States Air Force from 2001 to 2002. SA04, ¶ 11.

The essence of Curry's brand is the name "Diesel." He has adopted the alter ego "Chuck Diesel," his company is "Get Diesel Nutrition," his website is "GetDiesel.com," and the product at issue is "Diesel Test." SA04–05, ¶¶ 11–14. The Diesel brand has a national profile due to Curry's extensive advertising in fitness magazines since 2002. SA04–06, ¶¶ 14–15, 21. This advertising promoted several Diesel products, including Diesel Test, which entered the market in 2005. SA04–06, ¶¶ 14–16, 19–21. Diesel Test achieved additional prominence when it received awards from *Planet Muscle* magazine in 2015 and 2016. SA05, ¶ 15.

Success often breeds imitation. After Curry's Diesel Test won the *Planet Muscle* award, the defendants started selling a counterfeit version with the same

name.  The defendants admit that they started selling Diesel Test in October 2016 and have not denied that Curry started selling Diesel Test in 2005.  SA77, ¶ 25.

The original and counterfeit Diesel Test labels share striking similarities. Both use a right-slanted all-caps typeface and have a red and white color scheme. The photo below illustrates the resemblance (SA65):



Curry learned of defendants' infringement in November 2016 when he received complaints from confused consumers who blamed him for the defendants' sales practices.  SA06–07, ¶¶ 23–24; SA29–37.  He discovered that defendants had not only misappropriated the Diesel Test name, but also its history: the defendants' advertisements claimed that defendants won an award in a year when only Curry's product was on the market.  SA10, ¶ 37; SA63.  The defendants also undercut Curry's price on Amazon.com and the counterfeit appeared above the original in

Amazon's search results. SA41. Amazon subsequently delisted defendants' product after Curry brought the infringement to Amazon's attention. SA09, ¶ 32; SA57.

Curry's investigation into defendants' marketing unearthed deception that defendants have not denied. For example, the defendants concocted a fake "ESPN" webpage—complete with graphics copied from the real ESPN—that included a fake ESPN article touting defendants' version of Diesel Test. SA09–10, ¶ 35; SA59–62. Defendants also distributed an advertisement reporting the favorable results of allegedly nonexistent "clinical[]" testing. SA10, ¶ 36; SA66. Both forms of deceit were posted on the internet and therefore were available to the defendants' customers in Illinois. SA09–10, ¶35; SA66; SA77, ¶ 26 (admitting that "Revolution marketed and advertised Diesel Test through the Internet only"). The defendants' affidavits attempt to deny some contacts with Illinois, but do not deny making deceptive advertisements available in the forum. SA77, ¶¶ 26–27; SA81–83.

Deception was an effective sales technique. Defendants admit that in approximately six months they grossed more than $1.6 million from sales of Diesel Test. SA86, ¶ 6. At least 767 of these sales were to consumers in Illinois. SA86, ¶ 7.

Curry promptly took remedial action. First, in November 2016, he demanded that defendants cease and desist selling Diesel Test. SA44–46. Curry's written demand explained in detail that he had been selling Diesel Test since 2005 and included photos and links to his website documenting the infringement. *Id.*

Second, in December 2016, plaintiff filed a trademark application to formalize his rights in the Diesel Test name. SA06, ¶ 19. Curry previously had filed a published application for "Diesel," but for completeness also sought formal protection for "Diesel Test" with a first-use date in 2005. SA05–06, ¶¶ 18–19; SA27–28.[2]

Defendants responded to the cease and desist request by suggesting that they would seek an "amicable resolution." SA43. But instead they took a different path. Two weeks after receiving Curry's documented assertion of trademark rights in "Diesel Test," defendant Joshua Nussbaum filed a federal application for the exact same mark. SA47–50. The application falsely claimed that the "signatory believes that to the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce." SA49.[3]

Nussbaum's trademark application also made a misleading election. Applicants for trademarks must choose one of five potential "filing bases." 37 C.F.R. § 2.34(a). Two of these are "Use in commerce" and "Intent-to-use" in commerce; the other three are irrelevant because they relate to foreign conduct. *Id.* Nussbaum chose "Intent to Use." SA49. Yet at the time of the election the defendants were already using the mark by selling Diesel Test in interstate commerce and they had

---

[2] Federal law protects trademarks even if the owner has not sought federal registration. *See* 15 U.S.C. § 1125 (creating a private right of action for unfair competition); *Guar. Bank v. Chubb Corp.*, 538 F.3d 587, 593 (7th Cir. 2008) (noting that "15 U.S.C. § 1125(a) . . . unlike 15 U.S.C. § 1114(1)(a), protects unregistered marks").

[3] The declaration's exception for "concurrent users" is irrelevant here. It applies only when two unrelated entities seek to divide ownership of a mark based on "mode or place of use." 15 U.S.C. § 1052(d).

already created the fake "ESPN" marketing site.  SA77, ¶ 25; SA09–10, ¶ 35; SA59–62.  A trier-of-fact could infer that Nussbaum's misleading election was an attempt to conceal deceptive sales practices from the United States Patent and Trademark Office (USPTO).

The overlap between the parties' "Diesel Test" applications led the USPTO to suspend processing of both submissions.  SA10–11, ¶¶ 39–40.  Meanwhile, the defendants continued to market their counterfeit.  SA 10, ¶ 39; SA78, ¶¶ 29–32 (tabulating sales through June 1, 2017).

In March 2017, Curry filed a pro se complaint in the United States District Court for the Northern District of Illinois.  The Complaint alleged seven claims against four defendants.  Count one alleged that defendants' misappropriation and deceit violated the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS § 505/1 *et seq*.  SA11–12, ¶¶ 41–49.  Count two alleged a similar violation of the Illinois Uniform Deceptive Trade Practices Act (IUDTPA), 815 ILCS § 510/1 *et seq*.  SA12–13, ¶¶ 50–56.  Counts three, four, and six alleged unfair competition under the Lanham Act (15 U.S.C. § 1125) based on several theories, including false designation of origin, false advertising, trademark dilution, and cyberpiracy.  SA13–17, 18–19, ¶¶ 57–71, 81–90.  Count five alleged a trademark violation under Illinois common law.  SA17–18, ¶¶ 72–80.  Finally, Count seven invoked 15 U.S.C. § 1120, which states that: "Any person who shall procure registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation . . . shall be liable in a civil action by any person

injured thereby for any damages sustained in consequence thereof." SA20, ¶¶ 90–95.

Plaintiff's damages include harm to his reputation, past and future loss of sales, and the costs of investigating and challenging defendants' misconduct. SA12–13, 15–16, ¶¶ 48, 53, 64, 70. He seeks compensatory damages, statutory damages, punitive damages, attorney's fees, and an injunction. SA21–23.

The Complaint names two individual and two entity defendants. Revolution Laboratories, LLC ("Revolution") is the corporation that markets and sells defendants' products. SA77, ¶¶ 25–26. Rev Labs Management, Inc. ("Management") is, according to defendants, the "Manager of Revolution." SA75, ¶ 10. Joshua Nussbaum is the President of Revolution and Management. SA74–75, ¶ 6. Barry Nussbaum is the CEO of Revolution and a director of Management. SA82, ¶ 7.

### B. Proceedings in the District Court

The defendants moved to dismiss for lack of personal jurisdiction. DC Dkt. 35. The District Court granted the motion to dismiss without a hearing and then denied Curry's Rule 59(e) motion to alter or amend the judgment. A01, 14. This appeal followed.

### C. Defendants' Affidavits

Defendants relied on affidavits that dispute personal jurisdiction by denying intentional misconduct aimed at Illinois. Joshua and Barry Nussbaum wrote on

"behalf" of Revolution and Management as well as for themselves. SA74–75, ¶ 6; SA82, ¶ 7. The affidavits establish the opposite of what defendants intended. They admit more than enough to justify personal jurisdiction and their denials strain credulity.

The defendants first deny knowing that Curry was selling Diesel Test before the defendants started selling it in 2016. SA78–79, ¶ 33; SA83, ¶ 21. Accepting this story would require the Court to believe that the defendants: (1) invested time and money in the Diesel Test name without ever Googling it, which would have revealed Curry's website and marketing materials; (2) by coincidence picked the Diesel Test name from thin air soon after Curry's Diesel Test won a national award; and (3) by further coincidence selected a similar typeface and color scheme.

Defendants next deny "see[ing] any advertisements for products sold by Plaintiff until this lawsuit was filed." SA79, ¶ 34; SA83, ¶ 22. This assertion is puzzling because Curry's cease and desist letter—sent four months before the suit—provided links to his marketing materials and listed many of his advertisements. SA44–45. Curry even suggested "All you have to do is google 'Diesel Test.'" SA43. Crediting defendants' denial would require believing that they did not attempt even the slightest due diligence in response to the cease and desist letter. Simply typing "Diesel Test" into Google—or any other internet search engine—at any time before the suit would have revealed what defendants deny seeing.

Defendants then deny "know[ing] that Plaintiff was located in Illinois until this lawsuit was filed." SA79, ¶ 36; SA83, ¶ 23. This denial is implausible for the same reasons that undermine defendants' denial of knowing that Curry was selling Diesel Test. In addition, Curry's cease and desist letter provided a link to his website, and thus to his Illinois mailing address. SA43, 45. Defendants are also asking the Court to believe that they did not wonder "who is this guy threatening to sue us?" Even a cursory effort to learn about Curry would have revealed his location in Illinois.

The defendants also assert that "[o]n its website, Revolution does not hold itself out to do business in Illinois." SA76, ¶ 19. The record proves the opposite. Revolution's website facilitates shipments to Illinois by including "Illinois" in a drop-down menu for addresses. The Illinois option is shown in the lower left of the following screenshot (DC Dkt. 22-2, p.3):



Consumers in Illinois who order from Revolution's website receive a written acknowledgment of their Illinois shipping address and a note saying "Thank you again for your business." The screenshot below illustrates defendants' cheerful embrace of the Illinois market (DC Dkt. 22-3, p.1, redactions in original):



Next, Barry Nussbaum asserted that he has not "ever been involved in the marketing, sale, distribution, or manufacturing of any of the products sold by Revolution." SA83, ¶ 17. That denial is a convenient position for someone trying to avoid personal jurisdiction. But the denial is also curious because Barry Nussbaum is Revolution's "Chief Executive Officer." SA82, ¶ 7. He is asking the Court to believe that the CEO of a marketing and sales company does not oversee marketing and selling.

Finally, Joshua Nussbaum admits that he "learned of Plaintiff's claimed trademark on the name Diesel, Diesel Fuel and/or Diesel Test through a Facebook message sent by Plaintiff to Revolution on November 13, 2016." SA79, ¶ 35. This is an understatement given that Plaintiff also sent a lengthy email with links substantiating his ownership and use of the Diesel Test mark since 2005. SA44–46. Nussbaum's admission is troubling because two weeks after receiving the cease and desist request he declared to the USPTO that "to the best of the signatory's knowledge and belief, no other persons . . . have the right to use the mark in commerce." SA49; *see also supra* p.9 n.3. His declaration acknowledged that he was "warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001." SA49. The USPTO takes a dim view of applicants who fail to disclose known prior users with a superior claim, and here Nussbaum knew that Curry's claim dating to 2005 was superior to Nussbaum's claim dating to 2016. *See Ohio State Univ. v. Ohio Univ.*, 51 U.S.P.Q.2d 1289 (T.T.A.B. 1999) (holding that fraudulent statements in a trademark application can invalidate a registration). Even a prominent treatise writer who is skeptical of disclosure obligations acknowledges that a trademark applicant may fail to disclose senior users only if he has a "good faith belief" in his claim. 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31:77 (5th ed. 2018). Nussbaum would have a difficult time establishing good faith in light of evidence that he was trying to register an intentionally infringing counterfeit after receiving a detailed cease and desist letter.

Fortunately, the Court need not wade into factual questions about fraud and bad faith because the defendants admitted three key facts that establish jurisdiction. First, defendants admit that Revolution marketed Diesel Test through the internet, including by definition to consumers in Illinois. SA77, ¶ 26. Second, they admit that Revolution sold Diesel Test through its websites, including to consumers in Illinois. SA77, ¶ 27. Third, they admit that 4.3% of Revolution's total Diesel Test sales were to 767 consumers in Illinois. SA86, ¶¶ 6–7. As discussed below, these admissions are sufficient to establish personal jurisdiction in Illinois without delving into questions about whether the defendants aimed tortious conduct at a known target in the forum.

## SUMMARY OF ARGUMENT

The defendants cannot contort personal jurisdiction doctrine to evade accountability for their deceptive conduct. Both the Supreme Court and this Court have held that submitting to specific personal jurisdiction is a price that merchants pay for direct access to a state's market. If local sales cause local injuries, the state has a legitimate interest in providing local remedies. Accordingly, an avalanche of precedent upholds specific jurisdiction when out-of-state merchants infringe locally owned trademarks by directly selling products to buyers in the forum. The District Court's contrary decision is an unsustainable outlier.

The fact that sales occur over the internet does not insulate them from personal jurisdiction. Internet sales are similar to sales by phone or mail order catalog: the seller makes money by sending a product to the forum, which triggers a

16

reciprocal obligation to answer in the forum for harms caused by the sale. The technology underlying the internet is relatively opaque compared to the telephone, but opacity does not provide a get-out-of-jurisdiction-free card for savvy merchants.

The foregoing arguments are sufficient to require reversal. An additional ground for reversal is that the defendants intentionally aimed tortious conduct at the forum. They knew that misappropriating Diesel Test would injure Curry in Illinois and nevertheless chose to cause local harm. The defendants went even further than typical trademark infringers because they stole Curry's public identity. "Diesel" is Curry's alter-ego. By misappropriating that brand to tarnish plaintiff's reputation, defendants personalized and targeted their infringement. The District Court rejected this argument because the court relied on the defendants' affidavits denying both intentional infringement and knowledge of the plaintiff's presence in Illinois. Yet precedent rejects reliance on conclusory and incredible affidavits that contradict the Complaint's central allegations when there has been no discovery. The District Court should have drawn reasonable inferences in favor of the pro se plaintiff rather than simply accepting the defendants' implausible assertions.

## ARGUMENT

**I.    This appeal should focus primarily on jurisdiction over Revolution because the District Court never ruled on Curry's fact-intensive arguments supporting jurisdiction over the other three defendants.**

The District Court assumed that Management and the two Nussbaums could be subject to jurisdiction in Illinois only if Revolution is also subject to jurisdiction.

17

A11.  That assumption is mostly correct on the present record; an exception involves a claim against Joshua Nussbaum discussed later in this Section.  Revolution sold the infringing products and distributed deceptive marketing materials.  If Revolution's contacts with Illinois are insufficient to establish jurisdiction over itself, then Revolution's individual leaders and management company would also be immune from jurisdiction.

However, if Revolution is subject to personal jurisdiction, then jurisdiction may be appropriate over the other defendants based on their role in directing and implementing Revolution's deceptive practices.  Federal courts often find individual corporate leaders subject to personal jurisdiction depending on the unique facts of each case.  *See, e.g.*, *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 98 (2d Cir. 2016) (holding that because the CEO "exercised extensive control over [an LLC defendant's] day-to-day activities," the LLC's contacts with the forum helped establish jurisdiction over the CEO).[4]

---

[4] Management's amenability to suit presents a similar issue.  The only evidence in the record denying the Complaint's allegations about Management (SA02, ¶ 6) are two boilerplate affidavits contending that "Management has never been involved in the marketing, sale, distribution, or manufacturing of any of the products sold by Revolution." SA76, ¶ 16; *see also* SA83, ¶ 17.  Yet the affidavits also state that "Management was formed for the sole purpose of being the Manager of Revolution."  SA75, ¶ 10; SA82, ¶ 11.  Curry understandably is skeptical of Management's self-proclaimed ability to "manage" Revolution yet "never" entangle itself in Revolution's marketing and sales of a product that generated more than $1.6 million in revenue.  *See* DC Dkt. 43 pp. 8–13.  Because remand is already necessary for further proceedings against Revolution, and Joshua Nussbaum is the President of both Revolution and Management (SA74–75, ¶ 6), the District Court should have an opportunity to sort out uncertainty about Management's activities.

After dismissing claims against Revolution, the District Court summarily dismissed claims against the three remaining defendants. The dismissal order states that the court "does not need to consider" Curry's arguments related to Management and "need not address the parties' arguments" about the Nussbaums. A11. The court therefore did not resolve fact-intensive questions about corporate veil-piercing and the fiduciary shield doctrine.

Accordingly, an order reversing the District Court's dismissal of Revolution should vacate dismissal against the other three defendants and remand for further proceedings. The District Court rather than the Court of Appeals should be the first court to resolve fact-bound challenges to personal jurisdiction. *See Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.*, 264 F.3d 32, 38 (2d Cir. 2001) ("It is not clear from the record before us whether [defendants] purposefully availed themselves of the privilege of doing business in New York . . . . We find the district court is the proper forum for such an inquiry in the first instance. As the finder of fact, the district court is in the best position to make the necessary credibility judgments and discern what the facts are."); *cf. Rice v. Rice Found.*, 610 F.2d 471, 477 (7th Cir. 1979) (noting in the context of subject matter jurisdiction that "the district court should be given the first opportunity to resolve the jurisdictional issue" because it is "better equipped" to address competing factual contentions).

On remand, jurisdictional discovery would be appropriate if defendants continue to proffer implausible denials of relevant knowledge and intent. *See Philos Techs., Inc. v. Philos & D, Inc.*, 802 F.3d 905, 912 (7th Cir. 2015) (noting that

jurisdictional discovery "may be required" when the court must "assess credibility");

*Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 457–58 (3d Cir. 2003) (reversing denial of jurisdictional discovery in a trademark infringement action where the plaintiff sought information about the defendant's business practices);

*Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*, 395 F.3d 1315, 1323 (Fed. Cir. 2005) (reversing denial of jurisdictional discovery in a patent infringement action where plaintiff sought information about "the defendant's intent and purpose").

The rest of this brief's analysis of specific jurisdiction will therefore focus on Revolution, with one exception. The District Court devoted three sentences to one of Curry's arguments supporting jurisdiction over Joshua Nussbaum. The court stated:

> "Curry also contends that jurisdiction exists over Joshua based on the allegedly fraudulent trademark application that he filed with the PTO. This application was filed in Virginia, an act that has no relationship with Illinois. Thus it cannot be used to justify jurisdiction in Illinois."

A11–12. This Court should vacate the District Court's opinion to avoid setting an unnecessary, incorrect, and disruptive precedent.

First, the District Court overlooked the rationale for Nussbaum's liability. Curry's fraudulent application claim arises under 15 U.S.C. § 1120, which creates a right to sue for "damages sustained in consequence" of a "false or fraudulent declaration" in a trademark application. The reason Nussbaum's application was fraudulent and harmful is entangled in the issues on appeal regarding Revolution.

Nussbaum allegedly knew of and tried to undermine Curry's rights to the Diesel Test mark. SA14, 17, ¶¶ 59, 75. That tortious conduct was aimed at Curry in Illinois and was therefore a basis for personal jurisdiction. *See infra* Part III. Even without considering the aiming theory, Nussbaum's fraud was an attempt to preserve Revolution's market share, including in Illinois, and therefore Revolution's Illinois sales are relevant to the claim. *See San Diego Cty. Credit Union v. Citizens Equity First Credit Union*, 325 F. Supp. 3d 1088, 1099, 1101 (S.D. Cal. 2018) (finding personal jurisdiction in a § 1120 action because the defendant's filing in Virginia was designed to protect its business activities in the forum state).

Second, the District Court's incorrect holding has unsettling implications that the court did not consider. The holding posits that the only relevant jurisdictional contacts in a § 1120 action are filings in Virginia. If that conclusion is correct, then jurisdiction could never exist anywhere other than Virginia and the defendant's home state. This de facto venue constraint would surprise Congress and the numerous federal courts that routinely adjudicate § 1120 claims in plaintiffs' home states all around the country. Indeed, another court devoted five published pages to rejecting the 'only-in-Virginia' theory that the court in this case endorsed in three sentences. *See Citizens Equity*, 325 F. Supp. 3d at 1097–102.

If this Court reverses dismissal of claims against Revolution, it should not allow the District Court's cursory and disruptive holding about Joshua Nussbaum to stand. Discovery may moot the issue by making jurisdiction even clearer.

Otherwise, the District Court can reconsider jurisdiction over intentional fraud with the benefit of this Court's clarification of standards governing Curry's other claims.

## II. Illinois can exercise specific jurisdiction because Revolution's direct sales to 767 Illinois residents caused harm in Illinois.

A pervasive fantasy among tortfeasors is that the Constitution provides sanctuary if they are clever about structuring their misconduct. In case after case, merchants whose local sales cause harm in the forum state try to evade accountability with variations of the following assertion: "we did not physically cross the state line, so the state can't touch us." That argument worked in the nineteenth century, but it does not work today. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (rejecting *Pennoyer v. Neff*, 95 U.S. 714 (1878)).

This Court has succinctly explained why the practical realities of a national market enable states to provide local remedies for local harms:

> "[The defendant] wants to have its cake and eat it, too: it wants the benefit of a nationwide business model with none of the exposure. There is nothing constitutionally unfair about allowing Illinois, a state with which [the defendant] has had sufficient minimum contacts, to exercise personal jurisdiction . . . ."

*Illinois v. Hemi Grp. LLC*, 622 F.3d 754, 760 (7th Cir. 2010). This reasoning builds on the Supreme Court's observation that a defendant who has "availed himself of the privilege of conducting business" in a state must "submit to the burdens of litigation in that forum as well." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).

Revolution's admitted contacts with Illinois are sufficient to establish personal jurisdiction. First, Illinois has sought to assert jurisdiction by enacting a long-arm statute that extends to constitutional limits. *See Hemi*, 622 F.3d at 756–57. Second, jurisdiction satisfies constitutional limits when the defendant has purposeful minimum contacts with the forum state such that it enjoys the benefits and protection of the state's laws and should reasonably anticipate being sued there. *See Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 716 (7th Cir. 2002). Third, precedent discussed below holds that selling a product directly into the forum constitutes purposeful availment in a suit related to the sales. Fourth, precedent also establishes that Curry's claims relate to Revolution's sales because each sale caused a compensable injury.

A. **The Supreme Court, this Court, and other circuits routinely uphold personal jurisdiction when out-of-state merchants directly sell products to consumers in the forum and claims relate to injuries arising from those sales.**

The Supreme Court has held that directly selling a product to buyers in the forum establishes personal jurisdiction when the sales are related to the suit. The Court noted that jurisdiction was "unquestionable" when an out-of-state publisher sold a libelous monthly magazine in the forum. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984). Even a single local sale is sufficient to confer jurisdiction related to that transaction. In *McGee v. Int'l Life Ins. Co.*, an out-of-state insurer sold only one policy in California and yet was subject to California's jurisdiction in a suit by the beneficiary. 355 U.S. 220, 222 (1957).

Indirect sales present a more difficult problem than direct sales because the presence of an intermediary attenuates the defendant's purposeful connection to the forum. Cases involving the "stream of commerce"—in which the "the movement of goods from manufacturers through distributors to consumers" follows meandering currents—have therefore divided the Supreme Court. *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 881 (2011) (plurality opinion). However, the Court's cases addressing indirect sales have endorsed jurisdiction when sales are direct. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) (noting that jurisdiction is appropriate "if the sale of a product . . . is not simply an isolated occurrence" but instead results from efforts "to serve" the forum's market); *Nicastro*, 564 U.S. at 882 (plurality opinion) (noting that purposeful availment can occur when a defendant "targeted the forum" through "transmission of goods").[5]

Here, Revolution's sales to 767 Illinois residents were direct. The counterfeit Diesel Test did not float into Illinois on the unpredictable currents of the stream of commerce. Instead, Revolution operated a targeted shipping process: it requested shipping addresses, listed "Illinois" as an available shipping option, shipped to Illinois, and collected payments from Illinois residents. And all the while

---

[5] In an analogous context, the Supreme Court held that the Due Process Clause does not bar states from taxing local sales by online retailers who have no physical presence in the forum. Thus, Illinois could tax Revolution's sales of Diesel Test despite Revolution's assertion that it is immune from Illinois' authority. *See South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2089 (2018) (upholding statute authorizing taxation if the defendant engages in more than 200 transactions with state residents per year); *id.* at 2093 ("It is settled law that a business need not have a physical presence in a State to satisfy the demands of due process.").

Revolution marketed Diesel Test using deceptive materials that it made available to consumers in Illinois. In light of these direct purposeful contacts, "the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed." *Burger King*, 471 U.S. at 474.

This Court's precedents likewise emphasize the importance of direct transactions with consumers in the forum. For example, in *Illinois v. Hemi Grp. LLC*, the defendant sold approximately 300 cigarette packs—467 fewer units than Revolution—through its website to a buyer in Illinois. 622 F.3d 754, 755 (7th Cir. 2010). The Court refused to endow internet sales with special protection from normal jurisdictional principles. Instead, the Court held that the seller "stood ready and willing to do business with Illinois residents," so its "argument that it did not purposefully avail itself of doing business in Illinois rings particularly hollow." *Id.* at 758. Likewise, in *uBID, Inc. v. GoDaddy Grp., Inc.*, the defendant tried to avoid jurisdiction in Illinois by claiming that its local customers "unilaterally initiated" online transactions in response to untargeted "national" advertising that did not create meaningful contacts with the state. 623 F.3d 421, 428 (7th Cir. 2010). Revolution made the same argument in the District Court. It asserted that its customers in Illinois "unilateral[ly]" "stumbled upon" its website in response to "national" advertising. DC Dkt. 44, pp. 7–8 (relying on a district court decision from 1999). The Court in *uBid* saw through this pretense, noting that the defendant "purposefully directed its business activities toward [the forum] just as it had

toward all other states" and "cannot be unhappy" to have found customers in the forum. *uBid*, 623 F.3d at 428.

This Court's decisions involving internet sales build upon pre-internet caselaw upholding personal jurisdiction over out-of-state sellers. In *Logan Prods., Inc. v. Optibase, Inc.*, the Texas-based defendant used mail, telephones, and fax machines to solicit business in Wisconsin that constituted less than 2% of its national sales. 103 F.3d 49, 51–52 (7th Cir. 1996). These activities showed that the defendant "intentionally served the Wisconsin market" and "purposefully established sufficient minimum contacts to subject it to personal jurisdiction in Wisconsin." *Id.* at 53; *see also Hardy v. Pioneer Parachute Co.*, 531 F.2d 193, 195 (4th Cir. 1976) (upholding personal jurisdiction over an out-of-state distributor who sold 42 units in the forum through telephone orders generated by national magazine advertisements).

*Logan* highlights how the present appeal is no more an "internet" case than *Logan* was a "fax" case. Both *Logan* and this appeal are "sales" cases in which the defendant used the most current form of communication to transact with the forum's consumers. The internet streamlines national marketing and obviates some of the 'hands-on' sales practices that accompanied prior technologies. This innovation facilitating potentially harmful sales does not make sellers less accountable for injuries. States retain power to regulate local sales even as the technological foundation for commerce evolves. *See Hemi*, 622 F.3d at 759 ("we think that the traditional due process inquiry . . . is not so difficult to apply to cases

involving Internet contacts that courts need some sort of easier-to-apply categorical test").

Other circuits adjudicating trademark cases share this circuit's willingness to hold online merchants accountable for their conduct in the states where they directly sell their products. For example, the Second Circuit upheld jurisdiction in New York over a defendant in California that "operated a website which offered [infringing] bags for sale to New York consumers, permitted New York consumers to purchase such bags, and facilitated the shipment of those bags into New York." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 166 (2d Cir. 2010). The court deemed 52 transactions in the forum—715 fewer than Revolution's—to constitute "extensive business contacts" justifying jurisdiction. *Id.* at 166–67. Similarly, the Eleventh Circuit upheld jurisdiction over an out-of-state defendant who was "selling and distributing infringing goods through his website" to consumers in the forum. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1358 (11th Cir. 2013). Likewise, the Sixth Circuit upheld jurisdiction in a trademark case over a defendant that used its website to facilitate 14 annual transactions in the forum. *See Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 891–92 (6th Cir. 2002). The court observed that the defendant "could not mail test results to and accept payment from customers with Michigan addresses without intentionally choosing to conduct business in Michigan." *Id.* at 892.

Precedent leaves no room for the District Court's holding. Revolution's intentional sales to 767 Illinois consumers are more than sufficient to justify specific

jurisdiction in Illinois. To hold otherwise would be to allow Revolution to "have its cake and eat it, too." *Hemi*, 622 F.3d at 760. Worse, rejecting jurisdiction would allow Revolution to eat Curry's cake with impunity, sheltered from a pro se plaintiff who is unlikely to sue far from his home. *See Burger King*, 471 U.S. at 473–74 (stressing the importance of providing plaintiffs "with a convenient forum for redressing injuries inflicted by out-of-state actors" and observing that "it may well be unfair to allow [defendants] to escape having to account in other States" for the "consequences" of their "interstate activities") (citation omitted).

### B. The District Court's holding relied on inapposite precedent.

The District Court rested its holding on two decisions from this Court: *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440 (7th Cir. 2010) and *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796 (7th Cir. 2014). A08–09. Both are distinguishable. Indeed, as noted above, any other reading would run afoul of the Supreme Court's and this Court's precedent and would needlessly create a circuit split.

*Mobile Anesthesiologists* is irrelevant to whether marketing and selling products in the forum creates jurisdiction. In that case, the Court rejected jurisdiction in Illinois over a doctor whose "professional activities are limited entirely to the state of Texas." *Mobile Anesthesiologists*, 623 F.3d at 442. The doctor did not sell any products in the forum, he did not have any customers in the forum, and his internet advertisements offered services only in Texas. *See id.* The

28

sole issue was whether he aimed tortious conduct at the forum, which is an alternative theory of jurisdiction addressed in the next Section of this brief. But *Mobile Anesthesiologists* has nothing to say about Curry's direct sales theory.

*Advanced Tactical* is distinguishable for two overlapping reasons. First, the plaintiff in that case carried a higher burden of proof than Curry carries in this case because the District Court in *Advanced Tactical* held an evidentiary hearing. *See* 751 F.3d at 799. The plaintiff therefore needed to prove personal jurisdiction by a preponderance of the evidence rather than present only a prima facie case. *See id.* This distinction is important because *Advanced Tactical* faulted the plaintiff for failing to provide "evidence" that could link the defendant's sales to the plaintiff's infringement claim. *Id.* at 801. The plaintiff's claim was apparently related to statements on the defendant's website implying an affiliation among the parties rather than to the details of each sale. *See id.* The Court therefore held that the defendant's sales to the forum did not have "any connection with this litigation" and were not "litigation-specific conduct." *Id.* ("The only sales that would be relevant are those that were related to [defendant's] allegedly unlawful activity. [The plaintiff]—which has the burden of proof here—has not provided evidence of any such sales.").

In contrast, Revolution admits 767 local sales and Curry has made unrebutted allegations that consumers in Illinois were confused by defendants' deceptive advertising of a counterfeit that appropriated Curry's brand. SA11, ¶¶ 43, 45 (alleging that marketing "directed to Illinois consumers" resulted in "consumers

being misled into believing that defendants' products are in fact the same as plaintiff's products").  Indeed, even though the Nussbaums' affidavits proffer several implausible denials of wrongdoing, they do not even try to deny that Revolution's deceptive marketing confused Illinois consumers.  SA77, ¶¶ 26–27; SA81–83. Revolution's sales of Diesel Test in the forum are therefore the source of Curry's claims and defendants have not rebutted his prima facie case.  *See Hemi*, 622 F.3d at 759 (holding that the relatedness requirement was satisfied because the defendant "sold and shipped cigarettes to Illinois residents, and [its] actions surrounding those sales triggered Illinois's claims against it"); *Mosseri*, 736 F.3d at 1356 ("Here, Louis Vuitton's trademark claims arise out of [defendant's] contacts with Florida.  [Defendant's] ties to Florida all involve the advertising, selling, and distributing of alleged counterfeit and infringing Louis Vuitton goods into the state and accepting payment from Florida customers for such goods.  There is a direct causal relationship between [defendant], Florida, and Louis Vuitton's trademark claims.").

Second, the District Court relied on an out of context excerpt from *Advanced Tactical* doubting that "a plaintiff could bring suit in literally any state where the defendant shipped at least one item." A09 (quoting *Advanced Tactical*, 751 F.3d at 801).  This excerpt seems relevant in isolation, but is inapplicable when read in context.  The full paragraph from *Advanced Tactical* states:

> "Not only did Advanced Tactical fail to link the few sales to Real Action's litigation-specific activity, but even if it did, it is unlikely that those few sales alone, without some evidence linking them to the allegedly tortious activity, would make jurisdiction proper. See *Calder v. Jones*, 465 U.S.

783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). To hold otherwise would mean that a plaintiff could bring suit in literally any state where the defendant shipped at least one item. The creation of such *de facto* universal jurisdiction runs counter to the approach the Court has followed since *International Shoe*, and that it reaffirmed as recently as February 2014 in *Walden*. See also *Goodyear Dunlop Tires Operations, S.A. v. Brown*, — U.S. —, 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011)."

*Advanced Tactical*, 751 F.3d at 801–02.

The Court's statement that "sales alone" are insufficient is qualified by the observation that the sales were not "link[ed] . . . to the allegedly tortious activity." The citation to *Goodyear* amplifies this point because on the cited page *Goodyear* explains that specific jurisdiction requires case-related contacts. As noted above, in the present case Revolution's sales are inextricably linked to the tortious activity underlying Curry's claims. Moreover, *Advanced Tactical*'s citations to *Calder* and *Walden* show that the Court was thinking about the aiming/effects theory of jurisdiction, which is an independent argument from the direct sales theory advanced in this Section. The cited paragraph also does not purport to overrule *Hemi*, which had previously upheld jurisdiction based on the sale of 300 cigarette packs through a website. *See Hemi*, 622 F.3d at 755. Indeed, *Advanced Tactical* cited *Hemi* favorably. *See Advanced Tactical*, 751 F.3d at 802.

Accordingly, *Advanced Tactical* addressed idiosyncratic facts under a different theory of causation, a different theory of jurisdiction, and a different evidentiary standard. It did not purport to unsettle decades of pre-internet jurisprudence governing jurisdiction over direct sellers, to overrule *Hemi*, or to create a circuit split regarding the proper approach to personal jurisdiction in trademark cases.

Not surprisingly, courts in this circuit have not read *Advanced Tactical* to foreclose jurisdiction over out-of-state merchants whose direct local sales are related to the plaintiff's claims. Indeed, the decision under review is an outlier in its own District.[6]

Accordingly, this Court should hold that Revolution's 767 direct sales in Illinois that caused harm in Illinois are sufficient to justify personal jurisdiction in Illinois.

## III. An independent argument for specific jurisdiction is that Revolution intentionally aimed fraudulent conduct at a target in the forum and thereby caused economic and reputational harm in the forum.

"Diesel" is not just a brand; it is also the plaintiff's alter ego. Plaintiff markets his products under the name "Chuck Diesel" and his Diesel persona is "well known in the dietary supplement industry." SA04, ¶ 11. This personal image is an essential aspect of plaintiff's business. Indeed, Exhibit 1(a) to the plaintiff's pro se Complaint is a photo of himself captioned "Chuck Diesel." SA25. The Complaint

---

[6] *See Monster Energy Co. v. Wensheng*, 136 F. Supp. 3d 897, 907 (N.D. Ill. 2015) (Lefkow, J.) (distinguishing *Advanced Tactical* from *Hemi* and upholding jurisdiction over a Chinese website offering infringing products to Illinois consumers); *Republic Techs. (NA), LLC v. BBK Tobacco & Foods, LLP*, No. 16-CV-3401, 2017 WL 3386116, at *5, *6 n.6 (N.D. Ill. Aug. 7, 2017) (Bucklo, J.) (distinguishing *Advanced Tactical* from *Hemi* and upholding jurisdiction based on direct sales to Illinois, apparently at a lower volume than Revolution's sales); *Valtech, LLC v. 18th Ave. Toys Ltd.*, No. 14 C 134, 2015 WL 603854, at *3–4 (N.D. Ill. Feb. 12, 2015) (Kocoras, J.) (distinguishing *Advanced Tactical* and upholding jurisdiction while noting that "[a]lthough Defendants' sales in Illinois are very minimal in comparison to overall sales, these sales to Illinois residents still occurred, each resulting in an alleged intentional tort").

also repeatedly alleges harm to plaintiff's reputation and image.  SA04, 12–13, 15, 17, ¶¶ 11, 48, 53, 64, 71.

The merging of personal identity and brand adds a unique dimension to the jurisdiction inquiry in this case compared to other trademark cases.  Defendants did not simply infringe intellectual property that happened to be in Illinois.  Instead, they exploited a specific person, misappropriating both his brand and his identity and damaging his reputation.  That conduct aimed at a target in Illinois violated two Illinois statutes and Illinois common law, giving Illinois a "strong interest" in providing a remedy.  *Tamburo v. Dworkin*, 601 F.3d 693, 709 (7th Cir. 2010).

These factors provide an independent basis for jurisdiction and can help clarify confusing statements in current jurisprudence addressing the aiming test.  Subpart A explains how the aiming test developed, Subpart B applies precedent to Curry's claims, and Subpart C shows how the District Court erred by crediting the defendants' conclusory and incredible affidavits despite being obligated to accept Curry's factual allegations as true.

### A.     Development of caselaw governing the aiming test.

Defendants outside the forum who aim intentional wrongdoing at a target inside the forum are subject to jurisdiction in suits related to the local effects of their misconduct.  A classic example involves a person who stands on one side of the state line and fires a bullet that strikes an intended victim on the other side.  *See* Restatement (Second) of Conflict of Laws § 37 cmt. a (1971).  The aiming theory is

the only way for the victim's state to obtain jurisdiction if the shooter has no other contacts with the forum. The archaic territorial approach to jurisdiction precluded this aiming theory. *See Pennoyer v. Neff*, 95 U.S. 714, 727 (1878) ("Process from the tribunals of one State cannot run into another State, and summon parties there domiciled to leave its territory and respond to proceedings against them."). In contrast, the modern emphasis on "minimum contacts" embraces this theory by enhancing the states' authority to protect residents from outsiders. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

Fortunately, cross-border shootings are rare. Unfortunately, many other kinds of cross-border intentional torts are common. And unlike in a shooting—where the defendant and plaintiff must be in adjacent states—in many tort contexts technology enables wrongdoers to inflict harm in distant states without ever leaving their own states. Cases therefore address relatively evolved variations of the shooting fact pattern.

The sales theory discussed in the prior Section and the aiming theory discussed in this Section often arise concurrently (as they do here). But the theories are independent and conceptually different. Judge Fletcher explained the differences in an opinion for the Ninth Circuit. The sales theory depends on the concept of "purposeful availment," meaning that the defendant derived a benefit from its relationship with the forum, such as local sales. *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076–77 (9th Cir. 2011). The aiming theory depends on the concept of "purposeful direction," meaning that the defendant may

34

not have benefited from the forum yet still established a sufficient connection with the forum. *Id.* For example, a cross-border shooter does not avail himself of the victim's state, but does direct his activities toward that state. In contrast, a defendant sued under an indirect sales theory avails itself of a state's market without directing conduct toward the state. In Curry's case, both theories independently justify jurisdiction because Revolution availed itself of Illinois' market (as discussed above in Part II) and directed tortious conduct toward Illinois (as discussed in this Part).

The leading purposeful direction case is *Calder v. Jones*, 465 U.S. 783 (1984). In *Calder*, the Supreme Court unanimously held that a reporter and an editor for the *National Enquirer* based in Florida were subject to jurisdiction in California because they intentionally libeled an actress (Shirley Jones) who resided there. *See id.* at 789. The defendants' "actions were expressly aimed at California" and "they knew" that their target would suffer harm in California. *Id.* at 789–90. The Court concluded that "[a]n individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California." *Id.* at 790.

To see *Calder*'s kinship with the cross-border shooting scenario, which *Calder* apparently cited,[7] consider the following chain of hypotheticals. First, a person

---

[7] The Court cited the Restatement provision that includes the shooting scenario. *See Calder*, 465 U.S. at 789. A prior decision expressly acknowledged the shooting scenario without discussing it. *See Kulko v. Superior Court*, 436 U.S. 84, 96 (1978).

standing in Wisconsin who intentionally shoots a person in Illinois is subject to jurisdiction in Illinois. Second, the same result should follow if the bullet misses its target, but the ordeal causes a psychological rather than physical injury. Third, if intangible harms are sufficient, then reputational harms are also sufficient. Jurisdiction should therefore exist if instead of firing a gun the defendant in Wisconsin screams defamatory slurs about an Illinois resident that are heard by an intended audience in Illinois. This last scenario essentially is the *Calder* case, except the *Calder* defendants were further away from the forum and wrote rather than screamed.

The defendants in *Calder* also contacted sources in California and wrote about the plaintiff's activities in California. *See Calder*, 465 U.S. at 788. This extra contact was helpful for establishing jurisdiction, but was not essential for reasons that are evident from considering two hypothetical libelous *Enquirer* articles. The first article says: "John Doe, a prominent actor who lives and works in California, is a heroin addict. We know this because of a conversation with a source in California who witnessed behavior on a movie set in California." The second article is identical, except that the source was in Oregon and witnessed conduct on a set in Oregon. Both articles provide a basis for jurisdiction in California because of the false first sentence alleging heroin addiction, which targets a California resident and causes harm in California. Adding a second sentence referencing an Oregon source and Oregon behavior in no way diminishes the targeting of a California

resident, the harm in California, and California's interest in providing a forum. The extra contacts in *Calder* were therefore helpful but not essential.[8]

The Supreme Court noted the possibility that *Calder* could apply to "trademark infringement," but did not reach the issue. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 469 n.11 (1985); *cf. Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 929 n.5 (2011) (citing *Calder* and observing that "[w]hen a defendant's act outside the forum causes injury in the forum . . . a plaintiff's residence in the forum may strengthen the case for the exercise of *specific jurisdiction*") (emphasis in original).

The aiming theory is a good fit for intentional infringement cases. The infringer does not shoot a bullet into the forum, but it does intangibly reach into the forum to interfere with intellectual property and cause a local injury. States have power to protect their residents from this harmful incursion. *See Burger King*, 471 U.S. at 473 ("A State generally has a 'manifest interest' in providing its residents

---

[8] This Court has occasionally stated that *Calder* assumed that the defendants "entered" the forum "by the sale . . . of the magazine containing the defamatory material." *Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd. P'ship.*, 34 F.3d 410, 412 (7th Cir. 1994); *see also Tamburo v. Dworkin*, 601 F.3d 693, 705 (7th Cir. 2010) (citing *Indianapolis Colts*). That reading of *Calder* is not accurate. The relevant defendants in *Calder* were the reporter and editor, and the Supreme Court acknowledged that "their contacts with California are not to be judged according to their employer's activities there." *Calder*, 465 U.S. at 790. The defendants were therefore subject to jurisdiction despite not entering the state in any physical way. Indeed, *Calder*'s aiming theory was necessary because the *Enquirer*'s sales in the forum were not attributable to the defendants. If the sales counted, then the Court's direct sales theory in *Keeton*—decided the same day as *Calder*—would have resolved the *Calder* case without need for the aiming theory.

with a convenient forum for redressing injuries inflicted by out-of-state actors.")
(quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)).

Several circuits have invoked the aiming theory in trademark actions. *See Licciardello v. Lovelady*, 544 F.3d 1280, 1288 (11th Cir. 2008) (citing *Calder* to uphold jurisdiction in the trademark owner's home state); *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998) (same); *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1391 (8th Cir. 1991) (same). *But cf. McFadin v. Gerber*, 587 F.3d 753, 762 (5th Cir. 2009) (declining to apply *Calder* to a "passive" website); *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 714 (4th Cir. 2002) (same).

This Court has also adopted the aiming theory in trademark cases, but the precise contours of the test are not clear. Moreover, broad language in a recent Supreme Court decision creates a risk of confusion if read out of context. The best way to understand current caselaw is as follows.

First, before 2014, this Court held that *Calder*'s aiming theory applies in trademark cases. Initially, the Court cited *Calder* and stated in what was arguably dicta that "[b]y choosing a name that might be found to be confusingly similar to that of the [plaintiff], the defendants assumed the risk of injuring valuable property located in [the plaintiff's home state]." *Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd. P'ship.*, 34 F.3d 410, 411 (7th Cir. 1994). The Court then cited *Indianapolis Colts* for the proposition that "there can be no serious doubt after

*Calder* . . . that the state in which the victim of a tort suffers the injury may entertain a suit against the accused tortfeasor." *Janmark, Inc. v. Reidy*, 132 F.3d 1200, 1202 (7th Cir. 1997). A subsequent decision clarified that *Calder* requires "'something more' beyond injury in the forum state from an alleged intentional tort." *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 427 n.1 (7th Cir. 2010); *see also id.* at 436 (Manion, J., concurring) (applying *Calder* to uphold personal jurisdiction); *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 447 (7th Cir. 2010) (holding that *Calder* does not justify making "any defendant accused of an intentional tort subject to personal jurisdiction in the plaintiff's home state as soon as the defendant learns what that state is").

Second, in 2014, the Supreme Court decided *Walden v. Fiore*, which reaffirmed *Calder* while confirming its limits. 571 U.S. 277 (2014). In *Walden*, the defendant was a police officer who seized currency from two professional gamblers transiting the Atlanta airport en route to Nevada. *See Walden*, 571 U.S. at 279–80. He then helped write an allegedly false affidavit justifying retention of the plaintiffs' property. *See id.* at 280–81. The plaintiffs sued in Nevada even though all relevant conduct occurred in Georgia. *See id.* at 282. They tried to justify jurisdiction by arguing that the defendant knew that the seized currency was en route to Nevada and therefore knew that intentional misconduct would cause harm in Nevada. *See*

*id.*[9] The Court rejected jurisdiction using language that is prone to overreading if viewed out of context.

The context for *Walden* is a line of "unilateral activity" cases in which the Court rejected personal jurisdiction premised on the plaintiff's travels rather than the defendant's conduct. *Id.* at 284–91 (using the phrase "unilateral activity" three times) (citations omitted). This line of cases shares two elements: (1) the defendant established contacts with the plaintiff while the plaintiff was in a particular state; and (2) the plaintiff then traveled to a second state, suffered harm in that state, and used the harm as a predicate for jurisdiction in the second state. This was the fact pattern in *Walden* itself: the parties interacted in Georgia, but the plaintiffs then went to Nevada. The Court has repeatedly held that a plaintiff's unilateral travels cannot justify jurisdiction in a forum where the defendant did not establish a voluntary relationship. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980) (holding that a car dealer who sold a car in New York could not be sued in a distant state where the buyer took the car); *Rush v. Savchuk*, 444 U.S. 320, 322–23, 332–33 (1980) (holding that an Indiana resident who caused a car

---

[9] The defendant might also have known that the plaintiffs resided in Nevada—that fact is not clear from the record and the Court did not assume it. The District Court observed that the defendant "may have known that Plaintiffs lived in Nevada." *Fiore v. Walden*, No. 2:07-CV-01674-ECR, 2008 WL 9833854, at *3 (D. Nev. Oct. 17, 2008). The Ninth Circuit assumed only that the defendant knew that the plaintiffs "had a significant connection to Nevada." *Fiore v. Walden*, 688 F.3d 558, 578 (9th Cir. 2012). The Supreme Court then assumed that the defendant knew that plaintiffs "had Nevada connections." *Walden*, 571 U.S. at 289. *Walden*'s facts were therefore even more remote from *Calder* than a quick reading might suggest given that the defendants in *Calder* clearly knew that the plaintiff lived in California. *See Calder*, 465 U.S. at 790.

accident in Indiana that injured another Indiana resident was not subject to jurisdiction in Minnesota, where the victim had moved after the accident); *Hanson v. Denckla*, 357 U.S. 235, 238–39, 254 (1958) (holding that a Delaware-based trustee who formed a relationship in Delaware with a client who at the time resided in Pennsylvania was not subject to jurisdiction in Florida merely because the client later moved to Florida).

*Walden* cited the unilateral activity cases and explained that "mere injury to a forum resident is not a sufficient connection to the forum" and relevant contacts must establish a connection "with the forum State." *Walden*, 571 U.S. at 290. This reasoning made *Walden* a relatively easy case because the police officer's conduct in Georgia was not "tethered" to Nevada. *Id.*

The Court's unanimous opinion expressly reaffirmed *Calder*. *Walden* cited *Calder* as enforcing "[w]ell-established" doctrine and "illustrat[ing]" how that doctrine operates. *Id.* at 286, 291. *Walden* also declined to consider how *Calder* applies to cases involving the internet. *Id.* at 290 n.9.

*Walden*'s distinction between contacts *with a state* and contacts *with a person who resides in the state* would be misleading if removed from its context. Taken literally, the distinction would mean that a defendant in Wisconsin who intentionally shoots a plaintiff in Illinois is not subject to jurisdiction in Illinois because he aimed at a person rather than a government building, the ground, or some other manifestation of the sovereign. There is no reason to think that the

Supreme Court intended this odd result. But the Court's distinction between people and states makes more sense when viewed in the context of the unilateral activity cases. The relevant analogy would be to a defendant in Wisconsin who shoots an Illinois resident *in Wisconsin*, and the victim then travels to and sues in Illinois. Even though jurisdiction exists in Illinois when the bullet crosses the border to get to the victim, jurisdiction does not exist when the victim crosses the border after being hit by the bullet. The victim's presence in Illinois at the time of the shooting rather than after is what "tether[s]" the defendant to the forum. *Id.* at 290. *Walden* therefore requires conduct to be aimed at a person who is in the forum state, rather than at a person who later travels to the forum state. That is what the Court meant by its distinction between "contacts with the forum State itself" and "contacts with persons who reside there." *Id.* at 285.

In sum, "*Walden* serves to clarify *Calder*, but does not overrule it or limit its holding exclusively to libel cases. Rather, it makes clear that due process is not satisfied by a showing of 'mere injury to a forum resident'; a court must examine 'whether the defendant's conduct connects him to the forum in a meaningful way.'" *Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*, 817 F.3d 755, 771 (Fed. Cir. 2016) (O'Malley, J., concurring) (quoting *Walden*, 571 U.S. at 290).[10]

---

[10] Amicus Counsel wrote an article analyzing *Walden* and *Calder* in more depth and providing a normative justification for effects-based jurisdiction. The article proposes an expansion of *Calder*'s effects test, but the Court need not go as far to rule in Curry's favor given that the present case is close to *Calder*'s core and does not require considering whether jurisdiction should be available in harder cases. *See* Allan Erbsen, *Personal*

Third, after *Walden*, this Court revisited *Calder*'s application to trademark cases. The Court considered "whether harming a plaintiff in the forum state creates sufficient minimum contacts." *Advanced Tactical*, 751 F.3d at 802. It held that "there can be no doubt that 'the plaintiff cannot be the only link between the defendant and the forum.' . . . Any decision that implies otherwise can no longer be considered authoritative." *Id.* at 802 (quoting *Walden*, 571 U.S. at 285). This holding leaves open the question of how a plaintiff in a trademark action, or an unfair competition or fraud action, can show that the defendant created a meaningful connection with the forum.

A recent decision also leaves open the possibility of applying *Calder* in a trademark case. In *Ariel Investments, LLC v. Ariel Capital Advisors LLC*, a Florida company named "Ariel Capital" allegedly infringed the trademark of an Illinois company named "Ariel Investments." 881 F.3d 520, 521 (7th Cir. 2018). The infringement was not intentional because "[t]he founder of Ariel Capital testified, without contradiction, that he named the firm to honor his daughter, Ariel Marie Bray, rather than to injure Ariel Investments." *Id.* at 522. *Calder* was therefore irrelevant because there was literally no conduct aimed at the forum. In contrast, the Court noted that in a "trademark infringement" case, *Calder* might apply if the "wrong occurred" in the forum. *Id.* at 523. In *Ariel*, no wrong occurred in the forum because the defendant—unlike Revolution—"lack[ed] clients" in the forum. *Id.*

---

*Jurisdiction Based on the Local Effects of Intentional Misconduct*, 57 WM. & MARY L. REV. 385 (2015).

In sum, this Court's post-*Walden* decisions should not be read as repudiating *Calder*'s basic insight that aiming intentional misconduct at a known target in the forum and thereby causing harm in the forum can justify personal jurisdiction. Otherwise the Court would be saying that states cannot provide remedies in situations like the cross-border shooting case. That result would be a surprising retreat from modern jurisprudence that rejects archaic territorial rules. Accordingly, *Calder* is still a compelling precedent. The question is when it applies.

## B.    Application of the aiming test to Revolution.

An idiosyncratic fact enables the Court to clarify *Calder*'s relevance while leaving room for further incremental jurisprudence in future cases.

The Complaint includes three relevant allegations, all of which the Court assumes to be true when addressing a 12(b)(2) motion for which there was no evidentiary hearing. *See infra* Subpart C. In addition, courts are "obligated to liberally construe a *pro se* plaintiff's pleadings." *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 811 (7th Cir. 2017); *see also* Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice.").

The first two relevant allegations are present in many trademark cases involving online sales of counterfeits, but the third is "something more." First, Revolution "deliberately and willfully" infringed plaintiff's rights. SA14, ¶ 59. Second, Revolution aimed at the forum, which was Curry's home and the intended

situs of deception, confusion, and infringement.[11]  Third, Revolution intentionally sought to exploit goodwill associated with Curry's personal brand.  Curry therefore suffered a unique injury because of the connection between himself, "Chuck Diesel," and "Diesel Test."  Revolution in effect appropriated the plaintiff's identity, claimed his backstory as its own (for example, by pretending to have won an award while only Curry was selling Diesel Test, SA10, ¶ 37), and injured his personal "reputation."  SA12–13, ¶¶ 48, 53; *see also* SA17, ¶ 71 (alleging "willful intent to trade on plaintiff's reputation"); SA17, ¶ 75 ("Defendants have acted with knowledge of Plaintiff's ownership of the Trademarks . . . to unfairly benefit from the incalculable goodwill symbolized thereby."); SA15, ¶ 64 (alleging that the "public will be confused" and think that plaintiff "endorsed" defendants' Diesel Test).

The third allegation makes this case similar to a case in which the Eleventh Circuit upheld jurisdiction under *Calder*.  In *Licciardello v. Lovelady*, a talent manager in Tennessee infringed trademarks owned by an entertainer in Florida.  544 F.3d 1280, 1282 (11th Cir. 2008).  The defendant claimed to have no contacts with Florida other than the availability in Florida of his website, which included

---

[11] *See, e.g.*, SA03, ¶ 7 (defendants "maliciously promot[ed]" Diesel Test "to Illinois residents"); SA12, ¶ 46 ("misrepresentations were made with the intent that they be relied on by consumers, including . . . residents of the State of Illinois"); SA11, ¶¶ 43, 45 ("misrepresentations" were "directed to Illinois consumers" and resulted in "consumers being misled into believing that defendants' products are in fact the same as plaintiff's products"); SA03, ¶ 9 (defendants "purposefully direct[ed] acts complained of herein toward" Illinois and "caus[ed] injury within the State").

infringing material implying that the plaintiff endorsed the defendant.  *See id.* at 1284.  The court nevertheless upheld jurisdiction because:

> "The unauthorized use of [plaintiff's] mark, therefore, individually targeted [plaintiff] in order to misappropriate his name and reputation for commercial gain.  These allegations satisfy the *Calder* effects test for personal jurisdiction—the commission of an intentional tort, expressly aimed at a specific individual in the forum whose effects were suffered in the forum."

*Id.* at 1288.  Likewise, *Calder* itself emphasized the "injury" to the plaintiff's "reputation" in the forum.  *Calder*, 465 U.S. at 789.  Curry is not a famous entertainer like Shirley Jones, but as "Chuck Diesel" he is an award-winning celebrity in the field where he makes his living.  SA04–05, ¶¶ 11, 15.

"Illinois has a strong interest in providing a forum" in which Curry/Diesel can "seek redress for tort injuries suffered within the state and inflicted by out-of-state actors."  *Tamburo*, 601 F.3d at 709.  The fact that Revolution's conduct violated Illinois' statutory and common law further weighs in favor of jurisdiction.  As the Supreme Court explained, "in some cases, as with an intentional tort, the defendant might well fall within the State's authority by reason of his attempt to obstruct its laws."  *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 880 (2011) (plurality opinion).

This case does not involve the "unilateral activity" by a plaintiff that animated *Walden*.  Chuck Diesel was in Illinois before Revolution started infringing his brand and damaging his reputation.  Revolution selected a target in Illinois, misappropriated his brand and identity, and harmed both his business and his

46

reputation. *Calder* provides the closer analogy than *Walden* and the unilateral activity cases on which *Walden* relied.

Accordingly, Revolution should be accountable in Illinois for the economic and reputational harm that it purposefully directed to a known victim in the forum. Harder problems can await a case that presents them.

### C. The Nussbaums' conclusory and incredible affidavits do not overcome Curry's assumed-to-be true allegations.

The District Court rejected the aiming theory in part because it credited the Nussbaums' affidavits denying knowledge of Curry's location in Illinois until after he sued them. A10. The court's reliance was misplaced.

When there has been no hearing and no discovery, courts must draw inferences in favor of the non-moving party and must be skeptical of affidavits that simply assert the opposite of what the Complaint alleges. *See Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012) (noting that courts adjudicating a motion to dismiss for lack of personal jurisdiction must "accept as true all well-pleaded facts alleged in the complaint"); *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 423 (7th Cir. 2010) ("At this early stage in the litigation, and without the benefit of an evidentiary hearing, the plaintiff bears only the burden of making a prima facie case for personal jurisdiction."); *Nelson by Carson v. Park Indus., Inc.*, 717 F.2d 1120, 1123 (7th Cir. 1983) ("the party asserting [personal] jurisdiction is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record"); *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998)

(observing that requiring only a "relatively light standard" for establishing personal jurisdiction when there has been no hearing is necessary because "[a]ny other rule would empower a defendant to defeat personal jurisdiction merely by filing a written affidavit contradicting jurisdictional facts alleged by a plaintiff") (citation omitted).

The essence of Curry's complaint is that Revolution "acted with knowledge of Plaintiff's ownership of the Trademarks" to "trade on plaintiff's reputation." SA17, ¶¶ 71, 75. This would have been impossible without awareness of Curry's Illinois-based business, especially given his prominence as "Chuck Diesel." Yet the affiants want readers to believe that before the suit: (1) they imitated the Diesel Test name, typeface, and color scheme entirely by coincidence; (2) this coincidence happened to occur soon after Diesel Test gained prominence by winning an award; (3) they never Googled "Diesel Test" at any point in the product development process; (4) they continued to not Google "Diesel Test" after Amazon delisted their version and Curry threatened to sue them; (5) they never clicked on the link to GetDiesel.com that Curry sent them; and (6) during the four months between when they received the cease and desist letter and when Curry filed his Complaint, they made no effort to learn the most basic information about the man threatening to sue them. Indulging these incredible denials violated the District Court's obligation to credit plaintiff's factual allegations and draw inferences in his favor. *See Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1076–77 (10th Cir. 2008) (Gorsuch, J.) (declining to credit the defendants' "carefully drafted" effort to avoid *Calder* by

denying knowledge of the plaintiff's location when the record made that denial implausible); *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1352 (11th Cir. 2013) (noting in a trademark infringement case that the District Court correctly declined to credit incredible denials of jurisdictional facts).

On remand, Revolution would be free to reassert its denial of intentional infringement and targeting. Curry could respond by seeking discovery about how Revolution developed its version of Diesel Test. That information seems likely to be very illuminating.

## IV. Although specific jurisdiction exists in Illinois, the record does not support general jurisdiction.

The arguments above show that the District Court should have exercised specific jurisdiction over Revolution. Specific jurisdiction alone is sufficient to authorize a binding judgment and general jurisdiction is not required. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 n.15, 487 (1985) (upholding a state's authority to adjudicate based solely on an analysis of specific rather than general jurisdiction).

After carefully reviewing the record and relevant authorities, Amicus Counsel has not identified a basis for challenging the District Court's rejection of general jurisdiction. *See* Fed. R. App. P. 38.

General jurisdiction is much more difficult to obtain than specific jurisdiction. The Supreme Court has held that general jurisdiction is an "all-purpose" fallback

option for plaintiffs who need to sue in a state that has no "case-specific" connection

to the dispute. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 927

(2011). "In contrast . . . , specific jurisdiction is confined to adjudication of issues

deriving from, or connected with, the very controversy that establishes jurisdiction."

*Id.* at 919 (internal quotation marks and citation omitted).

Recent precedent tightened standards for general jurisdiction by limiting its

exercise to states where the defendant's contacts are so "continuous and systematic"

that it is "essentially at home." *Id.* (citation omitted); *see also Kipp v. Ski Enter.*

*Corp. of Wis.*, 783 F.3d 695, 698 (7th Cir. 2015) (noting that *Goodyear* "raised the

bar for this type of jurisdiction"). "Home" is an elastic concept, but it does not

stretch far enough to encompass the present case.

The "paradigm" forums in general jurisdiction cases are the state of an

individual's domicile and the states where a corporation is incorporated or has its

principal place of business. *Goodyear*, 564 U.S. at 924. Additional forums may be

available "in an exceptional case" that challenges conventional understandings of

"home." *Daimler AG v. Bauman*, 571 U.S. 117, 139 n.19 (2014). For example, one

can imagine an individual defendant who splits time between seasonal houses, a

corporate defendant with diffused leadership, or other idiosyncrasies that may

require adjusting doctrine at the margins. *See, e.g.*, *Alderson v. S. Co.*, 321 Ill. App.

3d 832, 849 (1st Dist. 2001) (citing "economic reality" to justify general jurisdiction

in Illinois over a defendant whose Indiana power plant abutting the Illinois border

transmitted virtually all its electricity to Illinois). This Court should therefore avoid inflexible formulations of the relevant test.

The record does not indicate that defendants are "essentially at home" in Illinois. None have a formal connection to Illinois, such as domicile or incorporation. And none have a practical connection beyond the ordinary footprint of an out-of-state merchant transacting business in the forum. That footprint supports specific jurisdiction but not general jurisdiction.

The Supreme Court rejected general jurisdiction under the "at home" standard in a case where the defendant had far more continuous and systematic contacts with the forum than are present here. In *BNSF Ry. Co. v. Tyrrell*, the Court held that a railroad was not "heavily engaged in activity in Montana" despite the presence of "over 2,000 miles of railroad track and more than 2,000 employees." 137 S. Ct. 1549, 1559 (2017). The dispositive factor was that these seemingly robust contacts were only a fraction of the defendant's national activities. *See id.* at 1554 (noting that the railroad had 32,500 miles of track and 43,000 employees).

*BNSF* indicates that if Revolution had sold the same volume of Diesel Test through physical stores in each state as it actually sold through the internet, its physical sales in Illinois would not create general jurisdiction. *Accord Goodyear*, 564 U.S. at 930 n.6 ("even regularly occurring sales of a product in a State do not justify the exercise of jurisdiction over a claim unrelated to those sales"); *Daimler AG v. Bauman*, 571 U.S. 117, 139 n.20 (2014) ("A corporation that operates in many

places can scarcely be deemed at home in all of them."); *id.* at 138 n.18 (suggesting that a "local office" does not establish general jurisdiction); *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 135 (2d Cir. 2014) (rejecting general jurisdiction premised on "branch offices in the forum").[12]  General jurisdiction on the actual record is even more implausible because Revolution has no physical presence in the forum and does a lower percentage of its business in Illinois than BNSF did in Montana.  *See uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 426 (7th Cir. 2010) (rejecting general jurisdiction over a company that hosted websites accessible in the forum); *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1226 (9th Cir. 2011) (rejecting general jurisdiction based on a locally accessible website).

Accordingly, the District Court's rejection of general jurisdiction was correct on the present record.

## CONCLUSION

Defendants cannot hide behind nineteenth-century notions of territoriality while using modern technology to reap $1.6 million from a counterfeit product. Revolution purposefully availed itself of Illinois by directly selling 767 deceptively advertised counterfeits to consumers in the state.  It also purposefully directed misconduct toward a known victim in Illinois that caused economic and reputational harm in Illinois.  Allowing Revolution "to be called to account" in

---

[12] Cases involving defendants with a large physical footprint in many states—such as a chain with thousands of stores or a manufacturer with several factories—would present difficult questions that this case does not raise.

Illinois based on these contacts is "presumptively reasonable." *Burger King*, 471 U.S. at 480.

The Court should reverse dismissal of claims against Revolution, vacate dismissal of claims against the other three defendants, and remand for further proceedings.

January 31, 2019                                          Respectfully submitted,

                                                         /s/  Allan Erbsen

                                                         Allan Erbsen
                                                         *Counsel of Record*
                                                         University of Minnesota Law School
                                                         229 19th Avenue South
                                                         Minneapolis, MN  55455
                                                         (612) 626-6632
                                                         aerbsen@umn.edu

                                                         *Court-Appointed Amicus Curiae*

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because according to Microsoft Word's "word count" feature it contains 13,468 words, including footnotes and excluding the parts exempted by Fed. R. App. P. 32(f). Circuit Rule 32(c) rather than Circuit Rule 29 governs the word limits for this Amicus brief. *See* Dkt. 33.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(b), and the type-style requirements of Fed. R. App. P. 32(a)(6), because it was prepared in Microsoft Word 2013 using a proportionally-spaced typeface (Century Schoolbook) for the text (12 point) and footnotes (11 point).

January 31, 2019

/s/  Allan Erbsen
Allan Erbsen
*Court-Appointed Amicus Curiae*

# REQUIRED SHORT APPENDIX

## Contents of the Attached Short Appendix

Opinion and Order Granting Motion to Dismiss (DC Dkt. 47)..............................A01

Judgment (DC Dkt. 48) ...............................................................................A13

Order Denying Motion to Alter or Amend Judgment (DC Dkt. 52) .......................A14

## Contents of the Separate Appendix

Complaint (DC Dkt. 1)............................................................................ SA01

Affidavit of Defendant Joshua Nussbaum in Support of Defendants'
Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction
(DC Dkt. 35, Ex. A) ............................................................................... SA74

Affidavit of Defendant Barry Nussbaum in Support of Defendants'
Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction
(DC Dkt. 35, Ex. B) ............................................................................... SA81

Supplemental Affidavit of Defendant Joshua Nussbaum in Support
of Defendants' Rule 12(b)(2) Motion to Dismiss (DC Dkt. 44, Ex. 1).................... SA85

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES CURRY d/b/a GET DIESEL NUTRITION, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 17 C 2283 |
| REVOLUTION LABORATORIES, LLC, REV LABS MANAGEMENT, INC., JOSHUA NUSSBAUM, and BARRY NUSSBAUM, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Charles Curry has filed suit against Revolution Laboratories, LLC (Revolution), Rev Labs Management, Inc. (Management), Joshua Nussbaum, and Barry Nussbaum, alleging that they infringed and diluted his trademark, violated the Illinois Consumer Fraud and Deceptive Practices Act, violated the Illinois Uniform Deceptive Trade Practices Act, engaged in false advertising and cybersquatting, and filed a fraudulent trademark application. Defendants have moved to dismiss the suit for lack of personal jurisdiction. For the reasons discussed below, the Court grants defendants' motion.

### Background

The Court takes the following facts from the complaint and evidence submitted by the parties in support of their arguments on defendants' motion to dismiss. Where facts are in dispute, the Court takes all facts in the light most favorable to Curry and

makes all reasonable inferences in his favor.  *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012).

Curry, a resident of Olympia Fields, Illinois, is the CEO and founder of Get Diesel Nutrition.  Founded in 2002, Get Diesel manufactures and sells dietary supplements. Since 2002, Get Diesel has placed over 100 print ads for its products in dietary and fitness magazines.  In March 2005, Get Diesel began manufacturing a dietary supplement named Diesel Test.  The company began advertising Diesel Test in June 2005.  In June 2016, Curry filed a trademark application for the marks "Diesel Fuel" and "Diesel" with a first-use date of June 2002.  Curry does not say whether these marks have been registered with the United States Patent and Trademark Office.

Revolution is a limited liability company organized under Nevada law with its principal place of business in California.  The company manufactures and distributes dietary supplements and apparel.  According to Curry, Joshua and Barry Nussbaum are co-founders of Revolution.  Joshua is also the president of the company, and Barry is the CEO.  The two men also created Management, a domestic corporation organized under Nevada law with its principal place of business in California.  Joshua and Barry created Management for the sole purpose of acting as manager of Revolution.  Joshua is the president of Management, and Barry is the director.

In November 2016, Curry learned that defendants were manufacturing and distributing a dietary supplement also named Diesel Test.  Curry began receiving messages from customers on Facebook requesting a free trial of the Diesel Test dietary supplement or a refund for their purchase of Diesel Test.  Curry realized that the customers mistakenly believed that his company had manufactured and sold the

2

supplements they purchased from defendants.  On November 13, 2016,[1] Curry sent

defendants a message on Facebook notifying them that they were infringing his

common-law trademark rights and demanding a halt to their sale and distribution of their

Diesel Test product.  On November 15, Curry sent a follow-up e-mail to Revolution in

which he renewed his claims and instructed the company to contact his attorney.

Defendants continued to market and sell their products.  On November 28, 2016,

Joshua filed a trademark application for the "Diesel Test" trademark.  Curry alleges that

this application fraudulently represented defendants' ownership of the trademark.  In

December 2016, Curry filed his own trademark application for the "Diesel Test"

trademark with a first-use date of April 2005.  In March 2017, the PTO suspended both

parties' applications for the "Diesel Test" trademark.

Curry then filed this suit, in which he contends that defendants knew of his

company and common-law trademarks on products such as Diesel Test.  He argues

that defendants intended to capitalize on his reputation in the nutrition community by

marketing a product with an identical name and very similar packaging in order to cause

consumers to believe that defendants' products were associated with his company.  In

count 1, Curry alleges that defendants are violating the Illinois Consumer Fraud and

Deceptive Practices Act by infringing on Curry's trademarks and by using false

advertising to make consumers believe their products are associated with Curry's

company.  He alleges in count 2 that the same conduct violates the Illinois Uniform

Deceptive Trade Practices Act.  In count 3, Curry alleges that defendants are engaging

---

[1] The complaint states that this occurred in 2017, not 2016.  Compl. ¶ 7.  Because
November 2017 is three months in the future, and based on the timeline of other events,
the Court believes Curry intended to say 2016.

in false designation of origin and false advertising in violation of the Lanham Act. He alleges in count 4 that defendants are diluting his trademarks through tarnishment. In count 5, Curry alleges that defendants are infringing his trademarks in violation of Illinois common law. He alleges in count 6 that defendants' use of domain names incorporating his "Diesel Test" trademark constitutes cybersquatting in violation of the Lanham Act. In count 7, Curry alleges that Joshua submitted a fraudulent trademark application for the "Diesel Test" mark.

In an affidavit submitted in support of defendants' motion to dismiss, Barry states that neither he nor Management has ever been involved in the marketing, sale, distribution, or manufacturing of Revolution's products. He states that they were not aware that Curry claimed to own trademarks on the names "Diesel," "Diesel Fuel," and "Diesel Test," or that Curry was selling products under those names. He states that neither he nor Management has ever seen any advertisements for Curry's products until this lawsuit. Joshua also states in his affidavit that he, Revolution, and Management were not aware that Curry claimed to own the trademarks or that Curry was selling products under those names. He states that they have never seen advertisements for Curry's products. He also states that he and Revolution first learned of Curry's trademark claims through the Facebook message and that they did not know Curry was located in Illinois until he filed this suit.

## Discussion

Defendants have moved to dismiss Curry's suit for lack of personal jurisdiction. They contend that they do not have the requisite contacts with Illinois to justify the exercise of either general or specific jurisdiction.

4

A04

Motions to dismiss for lack of personal jurisdiction are governed by Federal Rule of Civil Procedure 12(b)(2). Fed. R. Civ. P. 12(b)(2). Where a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction exists. *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 799 (7th Cir. 2014). The plaintiff need only make out a *prima facie* case of personal jurisdiction. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). If the defendant submits affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence to support personal jurisdiction. *Id.* The Court accepts as true all uncontroverted allegations in the complaint and resolves any factual disputes in favor of Curry. *Felland*, 682 F.3d at 672.

In a federal question case, "a federal court has personal jurisdiction over the defendant if either federal law or the law of the state in which the court sits authorizes service of process to that defendant." *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010). Where the federal statute at issue does not authorize nationwide service of process, personal jurisdiction is governed by the law of the forum state. *Id.* The Lanham Act does not authorize nationwide service of process. *be2 LLC v. Ivanov*, 642 F.3d 555, 558 (7th Cir. 2011). Therefore the Court's determination of personal jurisdiction is governed by Illinois law.

Illinois's long-arm statute permits the exercise of personal jurisdiction if it would be permitted under either the Illinois Constitution or the United States Constitution. *Mobile Anesthesiologists*, 623 F.3d at 443 (citing 735 Ill. Comp. Stat. Ann. 5/2-209(c)).

The Seventh Circuit has held that "there is no operative difference between these two constitutional limits" and therefore analyzes personal jurisdiction under Illinois law using the framework provided by federal due process requirements. *Mobile Anesthesiologists*, 623 F.3d at 443.

Under the due process clause of the Fourteenth Amendment, a defendant is subject to personal jurisdiction in a particular state only if the defendant had "certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). "[E]ach defendant must have purposely established minimum contacts with the forum state such that he or she should reasonably anticipate being haled into court there." *Tamburo v. Dworkin*, 601 F.3d 693, 701 (7th Cir. 2010) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). Personal jurisdiction can be general or specific, depending on the extent of the defendant's contacts. *Mobile Anesthesiologists*, 623 F.3d at 444. Curry contends that the Court has both general and specific jurisdiction over defendants.

A.     **General jurisdiction**

"A defendant that has 'continuous and systematic' contacts with a state is subject to general jurisdiction there in any action, even if the action is unrelated to those contacts." *Tamburo*, 601 F.3d at 702. This is a high standard—the defendant's contacts must be sufficiently pervasive to approximate physical presence in the forum state. *Id.*

Neither Revolution nor Management is subject to general jurisdiction in Illinois. A

6

corporation is typically subject to general jurisdiction only in the state of its incorporation and the state of its principal place of business. *Advanced Tactical*, 751 F.3d at 800. Both companies were incorporated in Nevada and operate out of California. Neither company is registered to do business in Illinois, owns property in Illinois, or has any employees in Illinois. Defs.' Rule 12(b)(2) Mot. to Dismiss for Lack of Personal Jurisdiction, Ex. B (Barry Affid.) ¶ 16. Further, Management—which was created for the sole purpose of managing Revolution—has no customers in Illinois. *Id.* ¶ 19. Revolution has sold its dietary supplements to customers in Illinois through the company's website. Defs.' Rule 12(b)(2) Mot. to Dismiss for Lack of Personal Jurisdiction, Ex. A (Joshua Affid.) ¶¶ 27, 29. But these contacts are insufficient to meet "the stringent criteria" of general jurisdiction. *Kipp v. Ski Enter. Corp. of Wis., Inc.*, 783 F.3d 695, 698 (7th Cir. 2015). Between October 2016 and June 2017, sales of Diesel Test to Illinois consumers represented only 4.3% of the company's nationwide sales of the product. These sales are not so substantial and of such a nature as to make Revolution "at home" in Illinois. Therefore the Court lacks general jurisdiction over both Management and Revolution.

The Court also lacks general jurisdiction over Barry and Joshua. For an individual defendant, general jurisdiction typically exists in "the individual's domicile." *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014). Both Barry and Joshua are citizens and residents of California. Barry Affid. ¶ 2; Joshua Affid. ¶ 2. Curry argues the Court should not credit Barry's affidavit because in a different affidavit attached to an earlier version of defendants' motion to dismiss, Barry states that he lives in Hawaii and works in both Hawaii and California. Pl.'s Resp. to Defs.' Mot. to Dismiss, Ex. A at 7–8. But

even if the Court were to discredit Barry's most recent affidavit, Curry alleges only that Barry is a resident of Nevada and Joshua is a resident of California. Therefore he has failed to allege that either Barry or Joshua is domiciled in Illinois. Further, both defendants state in their affidavits that they have visited Illinois on only one occasion, they have not conducted business in Illinois, and they do not own any property in Illinois. Barry Aff. ¶¶ 4–6; Joshua Aff. ¶¶ 3–5. These statements are uncontradicted by any evidence offered by Curry. Thus Curry has not made out a *prima facie* case that either Barry or Joshua is essentially at home in Illinois. The Court lacks general jurisdiction over the two individual defendants.

**B. Specific jurisdiction**

Specific personal jurisdiction is available only for a suit that arises out of the defendant's forum-related activity. *Advanced Tactical*, 751 F.3d at 800. Thus specific jurisdiction is appropriate where "(1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of defendant's forum-related activities." *Tamburo*, 601 F.3d at 702. The relationship giving rise to jurisdiction must stem from contacts that the defendant himself creates with the forum. *Advanced Tactical*, 751 F.3d at 801.

**1. Revolution**

Curry contends that Revolution has purposefully directed its activities at Illinois based on its online sales to Illinois customers of the allegedly infringing dietary supplements. The Seventh Circuit has stated, however, that a defendant's online sales of its product to consumers in the forum state, without more, is insufficient to support a

8

finding of specific jurisdiction, because "[t]o hold otherwise would mean that a plaintiff could bring suit in literally any state where the defendant shipped at least one item." *Id.* at 801; *see also Mobile*, 623 F.3d at 446.  The court has therefore indicated that the plaintiff must demonstrate that the defendant has deliberately and continuously exploited the market in the forum state through both its website and other contacts. *Mobile Anesthesiologists*, 623 F.3d at 446.  Curry has failed to allege that Revolution has contacts with Illinois in addition to its online sales that would justify the exercise of jurisdiction, such as an advertising campaign directed at Illinois, *see uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 427 (7th Cir. 2010), or publication of Curry's forum-state address and direction to consumers to boycott his products, *see Tamburo*, 601 F.3d at 706.  Therefore Curry has not alleged that Revolution purposefully directed its activities at Illinois.

In his response, Curry points to decisions in which this Court found specific jurisdiction over a defendant who was allegedly infringing on plaintiff's trademark.  Pl.'s Resp. to Defs.' Mot. to Dismiss at 15–16.  Curry argues that Revolution, by stating that it first used the "Diesel Test" mark in October 2016, has met the standard the Court has applied in previous cases because it has essentially admitted that it is the junior user of the mark and has no rights to use the mark.  *Id.* at 16.  Curry misapplies the Court's holding from its previous cases.  In those cases, the Court indicated that specific personal jurisdiction may exist over a defendant who is allegedly infringing on a plaintiff's trademark rights where the plaintiff has made a *prima facie* case that the defendant "deliberately set out to trade on the reputation of an Illinois entity."  *IPOX Schuster, LLC v. Nikko Asset Mgmt. Co.*, 191 F. Supp. 3d 790, 800 (N.D. Ill. 2016)

9

(Kennelly, J.). A defendant who "chooses to trade on the established name of an entity in the forum state and use that name for its own gain" has established a relationship with the forum state itself. *Ariel Invs., LLC v. Ariel Capital Advisors LLC*, No. 15 C 3717, slip op. at 5 (N.D. Ill. Oct. 29, 2015) (Kennelly, J.). The fact that Revolution indicates a later first-use date than Curry at this stage of the proceedings does not support Curry's allegations that the company willfully attempted to take advantage of his reputation by using his trademark. Barry and Joshua both state that, prior to this lawsuit, none of the defendants knew that Curry was selling a product called Diesel Test, knew that Curry had trademark rights in the "Diesel Test" mark, had seen any advertisements for Curry's products, or knew that Curry was located in Illinois. Joshua Affid. ¶¶ 33–36; Barry Affid. ¶¶ 21–23. Curry has not presented any evidence contradicting these contentions. *See IPOX*, 191 F. Supp. 3d at 800–01 (defendant's repeated communications with plaintiff both before and after plaintiff sent a cease-and-desist letter is evidence of an attempt to capitalize on plaintiff's trademark rights); *Ariel Invs.*, No. 15 C 3717, slip op. at 5 (finding specific personal jurisdiction where plaintiff presented evidence indicating defendant had likely come across plaintiff's trademark prior to the allegedly infringing conduct).

Further, the fact that Revolution continued to market its Diesel Test supplement after Curry notified the company of his alleged trademarks is insufficient to show that Revolution deliberately traded on his trademarks. *See Mobile Anesthesiologists*, 623 F.3d at 447. To hold otherwise would permit the plaintiff in a trademark infringement case to create personal jurisdiction by his own conduct, a premise that "finds no support in the case law." *Id*.

The Court therefore lacks specific personal jurisdiction over Revolution.

**A10**

### 2. Management

Management is not responsible for any sales of the allegedly infringing products, including to consumers in Illinois. Barry Affid. ¶ 17. And Curry does not allege any independent conduct by Management that creates a relationship with Illinois. Instead, Curry argues that Revolution's Illinois contacts should be attributed to Management under the doctrine of piercing the corporate veil. The Court does not need to consider this issue. Because Revolution's contacts are insufficient to justify the exercise of specific personal jurisdiction over the company itself, they likewise would be insufficient to support specific jurisdiction over Management.

### 3. Joshua and Barry

Curry makes two primary arguments in support of exercising specific jurisdiction over Barry and Joshua. He argues first that the two men are personally responsible for Revolution's sales to Illinois consumers by virtue of their control over the company and are not protected from personal jurisdiction under Illinois's fiduciary shield doctrine. He also argues that, even if the two men are not personally responsible for the Illinois sales, the Court should attribute Revolution's contacts to the two men under the doctrine of piercing the corporate veil. But again, Revolution's sales of its Diesel Test supplement to Illinois consumers are insufficient to justify the exercise of specific personal jurisdiction, whether they were personally conducted by Barry and Joshua or attributable to them as owners of Revolution. Therefore the Court need not address the parties' arguments regarding the fiduciary shield and piercing the corporate veil.

Curry also contends that jurisdiction exists over Joshua based on the allegedly fraudulent trademark application that he filed with the PTO. This application was filed in

Virginia, an act that has no relationship with Illinois. Thus it cannot be used to justify jurisdiction in Illinois.

### 4. Summary

For these reasons, the Court lacks specific personal jurisdiction over any of the defendants.

## C. Request for sanctions

In his response to defendants' motion, Curry requests sanctions against defendants and their counsel for allegedly misrepresenting legal authority and presenting frivolous arguments. *See, e.g.*, Pl.'s Resp. to Defs.' Mot. to Dismiss at 13 & n.37, 15 & n.41. The Court disagrees with Curry's characterization of defendants' conduct and therefore denies his request for sanctions.

## Conclusion

For the foregoing reasons, the Court grants defendants' motion to dismiss the claims against them for lack of personal jurisdiction [dkt. no. 35] and denies Curry's request for sanctions. The status and ruling date set for August 17, 2017 is vacated. The Clerk is directed to enter judgment dismissing the case for lack of personal jurisdiction.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: August 15, 2017

12

A12

ILND 450 (Rev. 10/13) Judgment in a Civil Case

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

CHARLES CURRY d/b/a GET DIESEL
NUTRITION ,

Plaintiff(s),

v.

REVOLUTION LABORATORIES, LLC, )
REV LABS MANAGEMENT, INC., )
JOSHUA NUSSBAUM, and BARRY )
NUSSBAUM ,

Defendant(s).

Case No.  17 C 2283
Judge Matthew F. Kennelly

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐     in favor of plaintiff(s)
and against defendant(s)
in the amount of $          ,

         which ☐ includes          pre–judgment interest.
         ☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☐     in favor of defendant(s)
and against plaintiff(s)

. 

Defendant(s) shall recover costs from plaintiff(s).

---

☒     other: Judgment entered dismissing the case for lack of personal jurisdiction.

---

This action was *(check one)*:

☐ tried by a jury with Judge          presiding, and the jury has rendered a verdict.
☐ tried by Judge          without a jury and the above decision was reached.
☒ decided by Judge Matthew F. Kennelly on a motion .

Date:   8/15/2017

Thomas G. Bruton, Clerk of Court

Pamela J. Geringer, Deputy Clerk

**A13**

## UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 6.1.1.2
### Eastern Division

Charles Curry

                                    Plaintiff,

v.                                                      Case No.: 1:17–cv–02283
                                                        Honorable Matthew F. Kennelly

Revolution Laboratories, LLC, et al.

                                    Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Sunday, September 10, 2017:

      MINUTE entry before the Honorable Matthew F. Kennelly: Plaintiff's motion to alter or amend the judgment [49] is denied. The Court respectfully disagrees with plaintiff's contention that the Court misunderstood or misapplied applicable Seventh Circuit decisions. The hearing date of 9/13/2017 is vacated. (mk)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**A14**

## CIRCUIT RULE 30(D) COMPLIANCE STATEMENT

I hereby certify that: (1) all the materials required by Circuit Rule 30(a) are included in the attached Short Appendix; and (2) all the materials required by Circuit Rule 30(b) are included in a Separate Appendix. The separate materials cannot be bound with the main brief because the two appendices collectively exceed fifty pages. *See* Circuit Rule 30(b)(7).

January 31, 2019

/s/  Allan Erbsen
Allan Erbsen
*Court-Appointed Amicus Curiae*

CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2019, I electronically filed the foregoing

Brief and Short Appendix with the Clerk of the Court for the United States Court of

Appeals for the Seventh Circuit by using the CM/ECF system.  Service of this filing

will be made on all parties and counsel by operation of the CM/ECF system.


January 31, 2019                                    /s/  Allan Erbsen
                                                    Allan Erbsen
                                                    *Court-Appointed Amicus Curiae*